**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN**

JEFF BERRY, as next of friend and father of one minor child, S.B.,

                                  Plaintiffs,

        v.

THE CITY OF FLINT, a Michigan municipal corporation; DARNELL EARLEY, (individually and in his official capacity as Emergency Manager); HOWARD CROFT, (individually and in his official capacity as Flint's Director of Public Works); MICHAEL GLASGOW, (individually and in his official capacity as an employee of the City of Flint); STATE OF MICHIGAN; RICHARD SNYDER, (individually and in his official capacity as Governor of Michigan); GERALD AMBROSE, (individually, and in his official capacity as Emergency Manager); STATE OF MICHIGAN DEPARTMENT OF ENVIRONMENTAL QUALITY; LIANE SHEKTER-SMITH, (individually and in her Official capacity as Chief of the Office of Drinking Water and Municipal Assistance for MDEQ); DANIEL WYANT, (individually and in his official capacity as Director of MDEQ); STEPHEN BUSCH, (individually and in his official capacity as District Supervisor for MDEQ); PATRICK COOK, (individually and in his capacity as Water Treatment Specialist for MDEQ); MICHAEL PRYSBY, (individually and in his capacity as an Engineer for MDEQ); BRADLEY WURFEL, (individually and in his capacity as Director of Communications for MDEQ); STATE OF MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES; EDEN WELLS, (individually and in her capacity as Chief Medical Executive for MDHHS); NICK LYON, (individually and in his capacity as Director of MDHHS); NANCY PEELER, (individually and in her  official capacity as an employee of the MDHHS); ROBERT SCOTT,(individually and in his official capacity as an employee of MDHHS); ANDY DILLON (individually and in his official capacity as Treasurer of Michigan), ADAM ROSENTHAL (individually and in his official capacity as Water Quality Analyst for MDEQ); JEFF WRIGHT (individually and in his official capacity as Genesee County Drain Commissioner); EDWARD KURTZ (individually and in his official capacity as Emergency Manager); DAYNE WALLING (individually and in his official capacity as Mayor of Flint); and DAUGHERTY JOHNSON (individually and in

Case No.

1

his official capacity as Utilities Administrator for Flint),          )
                                                                      )
                                                    Defendants.   )

## COMPLAINT AND JURY DEMAND

Plaintiffs, by and through their attorneys, complaining against Defendants herein, state as follows:

## INTRODUCTION

1.      This case arises from the poisoning of Plaintiffs, residents of the City of Flint, Michigan, with lead from Flint's pipes and service lines, as a result of the switch of Flint's drinking water supply to the Flint River, without the use of any corrosion control.

2.      Defendants created and maintained this condition when the State of Michigan subsumed the authority of the local government; and also through the actions of the state's regulatory and administrative entities and employees.

3.      In 2014, Defendants discovered that dangerous levels of lead were leaching into Flint's drinking water.  Not only did Defendants fail to take any measures to eliminate this danger, as required by federal law, but they actually took affirmative steps to downplay the severity of the contamination from its citizens.  In so doing, Defendants negligently and recklessly exposed Plaintiffs to devastating and irreversible health problems.

4.      Plaintiffs seek recovery from Defendants for injuries, damages and losses suffered by Plaintiffs as a result of exposure to the introduction of lead and other toxic substances from Defendants' ownership, use, management, supervision, storage, maintenance, disposal, and release of highly corrosive water from the Flint River into the drinking water of Flint, Michigan.

5.      The actions of the City of Flint and the State of Michigan, along with their agencies and employees in inflicting immeasurable harm on Plaintiffs amounts to violations of Plaintiffs' constitutional rights.

6.      The injuries to Plaintiffs resulted not only from the acts of the individual Defendants but from the policy and/or practice of the State of Michigan, its agencies, and the City of Flint.

7.      Defendants, acting for the state and/or city under color of law, deprived Plaintiffs of their constitutional rights.

8.      The State of Michigan and/or City of Flint provided a mantle of authority to the individual Defendants that enhanced their power as harm-causing individual actors.

9.      The individual Defendants' conduct was so dominated by governmental authority that the individual Defendants must be deemed to act with the authority of the government.

10.      Plaintiffs bring this action for damages against those Defendants named in their individual capacities who acted under color of law in depriving Plaintiffs of their constitutional rights, and against the City of Flint.

11.      Plaintiffs bring this action for prospective relief only as against the State of Michigan, the Michigan Department of Environmental Quality, and the Michigan Department of Health and Human Services.

12.      The health effects of lead poisoning are well known.  The CDC has noted that: "No safe blood level in children has been identified.  Even low levels in blood have been shown to affect IQ, ability to pay attention, and academic achievement." Lead impacts nearly every organ and system in the human body.  Lead causes multitudinous and serious injuries to the nervous system, which can lead to convulsions, coma and brain death.  It causes learning and

behavioral disorders, memory loss, nausea, anemia, hearing loss, fatigue, colic, hypertension, and myalgia.

13.     As a direct and proximate result of Defendants' negligent, grossly negligent, and reckless conduct, Plaintiffs were directly exposed to hazardous and toxic substances known to cause disease, and that this exposure caused or contributed to Plaintiffs' injuries. Therefore, the doctrine of joint and several liability should be extended to apply to each Defendant herein, in their individual capacity.

14.     As a direct and proximate result of the Defendants' conduct, Plaintiffs have suffered injuries and currently suffer and will continue to suffer damages and losses which include, but are not limited to, physical and psychological injuries, learning and other permanent disabilities, pain, mental anguish, emotional distress, the loss of household services, the cost of medical, educational and rehabilitation expenses and other expenses of training and assistance, and loss of earnings, income, and earning capacity. Such injuries, damages and losses are reasonably likely to continue to occur in the future.

**PARTIES**

15.     Plaintiff JEFF BERRY is, and has at all times relevant hereto been, a resident of Flint connected to Flint's water system and a paying consumer of Flint water. JEFF BERRY and his minor child S.S., have been exposed to extremely high levels of lead due to the actions of the Defendants, having bathed in and consumed lead contaminated water.

16.     Plaintiffs are, and have at all times relevant hereto been, residents of Flint connected to Flint's water system. Plaintiffs have been exposed to extremely high levels of lead due to the actions of the Defendants, having bathed in and consumed lead contaminated water.

4

17.    As a result of Defendants' actions, Plaintiffs have suffered injuries including but not necessarily limited to: various health problems (including without limitation, hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and property damages (including but not limited to damaged plumbing and lost real property value).

18.    Defendant City of Flint ("Flint" or "the City") is a Michigan municipal Corporation located in Genesee County, Michigan, so authorized by the laws of the State of Michigan that operates the Department of Public Works and provides water to its residents and property owners as part of its responsibilities and services.

19.    Through its Department of Public Works, Flint distributes water to its nearly 100,000 residents.

20.    When Flint Emergency Manager, Darnell Earley ("Earley"), as the City's final policymaking authority, made the decision, on behalf of the State of Michigan and the City, to rush the distribution of water from the Flint River without proper treatment, including corrosion control, Plaintiffs were poisoned.

21.    Defendant Earley was Governor Snyder's Emergency Manager in Flint from November 1, 2013, through January 12, 2015, and at all times relevant hereto was acting within the scope of his employment and/or authority under color of law.  He is sued herein in his official and individual capacities.  Earley made the decision to switch to Flint River water.  Earley made false and/or misleading statements representing that the water was safe to drink as it poisoned

5

thousands.  Earley violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger.  Earley's actions constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

22.    It was the official custom, policy, and/or practice of the City, for which it is directly responsible, that led to the violations of Plaintiffs' constitutional rights described herein.

23.    The actions of lower level City employees, not named as defendants herein, in delivering residents unsafe water were constrained by policies not of their own making.  Flint's water treatment employees were inadequately trained, in light of the duties assigned to them the need for more training was obvious, and the inadequacy was so likely to result in the violation of constitutional rights that Flint's policy makers can reasonably said to have been deliberately indifferent to the need for additional training.  The City is liable because through its policy makers it violated the constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger.

24.    Defendant Howard Croft ("Croft") was at all relevant times Flint's Department of Public Works Director acting within the scope of his employment and/or authority under color of law.  He is sued herein in his individual and official capacities.  At all relevant times Croft knew that the City's water treatment plant was unprepared to adequately provide safe drinking water to Flint's residents.  He nonetheless caused and allowed unsafe water to be delivered to Flint's residents and did not disclose that Flint's water was unsafe.

25.    Defendant Croft also made numerous false statements about the safety and quality of Flint's water that he knew to be untrue.  Defendant Croft violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to

be free from state created danger.  Defendant Croft's actions further constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

26.     Defendant Michael Glasgow ("Glasgow") was at all relevant times a water treatment plant operator for the City of Flint acting within the scope of his employment and/or authority under color of law.  He is sued herein in his individual and official capacities.  Glasgow knew that the City's water treatment plant was unprepared to adequately provide safe drinking water to Flint's residents.  He nonetheless allowed unsafe water to be delivered to Flint's residents and did not disclose that Flint's water was unsafe.   Defendant Glasgow violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger.  Defendant Glasgow's actions further constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

27.     Defendant State of Michigan ("Michigan" or "the State") directs, controls, and operates Defendant Michigan Department of Environmental Quality ("MDEQ") and Defendant Michigan Department of Health and Human Services ("MDHHS").  The State also stood in the shoes of the City of Flint at all times relevant hereto, having absorbed the authority of the City of Flint.

28.     Defendant Richard Snyder ("Governor Snyder" or "Snyder") is the Governor of Michigan.  He is sued herein in his individual and official capacities.  He was at all times acting within the scope of his employment and/or authority under color of law.  Governor Snyder participated in, directed, and facilitated the State's decision to transition Flint's water source from safe, treated water to untreated corrosive water that would deliver lead into Plaintiffs' home.  He

7

also participated in, directed, and facilitated the State's insufficient response to protect Plaintiffs from the State's actions.

29.     Under color of state law, Governor Snyder violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger.

30.     Defendant Gerald Ambrose ("Ambrose") was Governor Snyder's Emergency Manager in Flint from January 13, 2015, until April 28, 2015, and was at all times relevant hereto acting within the scope of his employment and/or authority under color of law.  He is sued herein in his official and individual capacities.  Defendant Ambrose was also an employee of the State of Michigan as a financial advisor for Flint's financial emergency from January 2012, until December 2014.  He was involved in and directed the State's decision to transition Flint from safe, treated water on an aggressive timeline to corrosive, untreated water from an unprepared water treatment plant.  He also made false and/or misleading statements representing that the water was safe to drink as it poisoned thousands.  Defendant Ambrose violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger.  Defendant Ambrose's actions constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

31.     Defendant Michigan Department of Environmental Quality ("MDEQ") is the state agency responsible for implementing safe drinking water laws, rules, and regulations in Michigan, and Flint specifically.  The MDEQ failed to require corrosion control for Flint River water, conducted illegal and improper sampling of Flint's water, lied to the public about the safety of Flint's water, and attempted to publicly discredit outside individuals that offered evidence of the

water's contamination.  The MDEQ was consistently more concerned with satisfying its own perceptions of technical rules than carrying out its duty to the people of Flint, ignoring voluminous evidence of the crisis it had created until its denial could no longer withstand outside scrutiny.

32.     Defendant Liane Shekter-Smith ("Shekter-Smith") was at all relevant times Chief of the Office of Drinking Water and Municipal Assistance for MDEQ, acting within the scope of her employment and/or authority under color of law, until she was removed from her position on October 19, 2015.  She is sued herein in her individual and official capacities.  Defendant Shekter-Smith was grossly negligent in that she knowingly participated in, approved of, and caused the decision to transition Flint's water source to a highly corrosive, inadequately studied and treated alternative.  She disseminated false statements to the public that led to the continued consumption of dangerous water despite knowing or having reason to know that the water was dangerous. Defendant Shekter-Smith violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger.  Defendant Shekter-Smith's actions constitute gross negligence, as she had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

33.     Defendant Daniel Wyant ("Wyant") was at all relevant times the Director of MDEQ until Governor Snyder accepted his resignation on or about December 29, 2015, acting within the scope of his employment and/or authority under color of law.  He is sued herein in his official and individual capacities.  Wyant participated in, directed, and oversaw the MDEQ's repeated violations of federal water quality laws, the failure to properly study and treat Flint River water, and the MDEQ's program of systemic denial, lies, and attempts to discredit honest outsiders.  He disseminated false statements to the public that led to the continued consumption of

dangerous water despite knowing or having reason to know that the water was dangerous. Defendant Wyant violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger. Defendant Wyant's actions constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs

34.     Defendant Stephen Busch ("Busch") was at all relevant times the District Supervisor assigned to the Lansing District Office of the MDEQ and was acting within the scope of his employment and/or authority under color of law. He is sued herein in his official and individual capacities. He participated in MDEQ's repeated violations of federal water quality laws, the failure to properly study and treat Flint River water, and the MDEQ's program of systemic denial, lies, and attempts to discredit honest outsiders. He personally falsely reported to the EPA that Flint had enacted an optimized corrosion control plan, providing assurances to Plaintiffs that the water was safe when he knew or should have known that these assurances were false, or were no more likely to be true than false. Defendant Busch violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger. Defendant Busch's actions constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

35.     Defendant Patrick Cook ("Cook") was at all relevant times Water Treatment Specialist assigned to the Lansing Community Drinking Water Unit of the MDEQ and was acting within the scope of his employment and/or authority under color of law. He is sued herein in his official and individual capacities. Cook is individually liable because he, as the Lansing Community Drinking Unit manager, in a grossly negligent manner, participated in, approved,

and/or assented to the decision to allow Flint's water to be delivered to residents without corrosion control or proper study and/or testing.  Defendant Cook violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger.  Defendant Cook's actions constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

36.     Defendant Michael Prysby ("Prysby") was at all relevant times the Engineer assigned to District 11 (Genesee County) of the MDEQ and was acting within the scope of his employment and/or authority and was acting within the scope of his employment and/or authority under color of law.  He is sued herein in his official and individual capacities.  Prysby is individually liable because he, as the engineer assigned to District 11, participated in, approved, and/or assented to the decision to switch the water source, failed to properly monitor and/or test the Flint River water, and provided assurances to Plaintiffs that the Flint River water was safe when he knew or should have known those statements to be untrue, or no more likely to be true than false.  Defendant Prysby violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger.  Defendant Prysby's actions constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

37.     Defendant Bradley Wurfel ("Wurfel") was at all relevant times the Director of Communications for MDEQ and was acting within the scope of his employment and/or authority under color of law.  He is sued herein in his official and individual capacities.  Wurfel resigned his position on December 29, 2015.  Wurfel served as the MDEQ's principal means of public deception, repeatedly denying the increasingly obvious disaster as it unfolded and attempting to

discredit the only reliable people in the picture.  Wurfel would eventually be relieved of his duties for his "persistent [negative] tone and derision" and his "aggressive dismissal, belittlement and attempts to discredit the individuals involved in [conducting independent studies and tests]."

38.     Defendant, Wurfel repeatedly made public statements that created, increased, and prolonged the risks and harms facing Plaintiffs.  Defendant Wurfel violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger.  He made such statements knowing that they were false or that they were no more likely to be true than false.  Defendant Wurfel's actions constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

39.     Defendant Michigan Department of Health and Human Services ("MDHHS") is the state agency responsible for public health.  Instead of protecting public health, MDHHS deliberately hid information that would have revealed the public health crisis in Flint, which MDHHS had earlier failed to detect.  MDHHS's failure to properly analyze data led it to conclude that there was no increase in lead contamination in Flint's children, and it resisted and obstructed the efforts of outside researchers and the County health department to determine whether that was the actually true and correct.

40.     Defendant Eden Wells ("Wells"), was at all relevant times Chief Medical Executive within the Population Health and Community Services Department of the MDHHS and was acting within the scope of her employment and/or authority under color of law.  She is sued herein in her official and individual capacities.  Wells participated in, directed, and/or oversaw the department's efforts to hide information to save face, and to obstruct the efforts of outside researchers.  Further, Wells knew as early as 2014 of problems with lead and legionella

12

contamination in Flint's water and instead of fulfilling her duty to protect and notify the public, she participated in hiding this information. Defendant Wells violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger. Defendant Wells' actions constitute gross negligence, as she had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

41. Defendant Nick Lyon ("Lyon") was at all relevant times Director of MDHHS and was acting within the scope of his employment and/or authority under color of law. He is sued herein in his official and individual capacities. He participated in, directed, and/or oversaw the department's efforts to hide information to save face, and to obstruct and discredit the efforts of outside researchers. He knew as early as 2014 of problems with lead and legionella contamination in Flint's water and instead of fulfilling his duty to protect and notify the public, he participated in hiding this information. Defendant Lyons violated clearly established constitutional rights of Plaintiffs including but not limited to the rights to bodily integrity and to be free from state created danger. Defendant Lyons' actions constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

42. Defendant Nancy Peeler ("Peeler") was at all relevant times a MDHHS employee in charge of its childhood lead poisoning prevention program, acting within the scope of her employment and/or authority under color of law. She is sued herein in her official and individual capacities. She participated in, directed, and/or oversaw the department's efforts to hide information to save face, and actively sought to obstruct and discredit the efforts of outside researchers. Even when her own department had data that verified outside evidence of a lead

contamination problem, she continued trying to generate evidence to the contrary. Defendant Peeler violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger. Defendant Peeler's actions constituted gross negligence, as she had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiffs.

43.     Defendant Robert Scott ("Scott") was at all relevant times Data Manager for MDHHS's Healthy Homes and Lead Prevention Program, acting within the scope of his employment and/or authority under color of law. He is sued herein in his official and individual capacities. He participated in, directed, and/or oversaw the department's efforts to hide information to save face, and actively sought to obstruct and discredit the efforts of outside researchers. Even when his own department had data that verified outside evidence of a lead contamination problem, he continued trying to generate evidence to the contrary. He also served a key role in withholding and/or delaying disclosure of data that outside researchers needed to protect the people of Flint. Defendant Scott violated clearly established constitutional rights of Plaintiffs, including but not limited to the rights to bodily integrity and to be free from state created danger. Defendant Scott's actions constitute gross negligence, as he had a substantial lack of concern and/or willful disregard for whether an injury resulted to Plaintiff.

44.     Defendant Andy Dillon ("Dillon") was at all relevant times Treasurer for the State of Michigan, acting within the scope of his employment and/or authority under color of law. He is sued herein in his official and individual capacities. Defendant Dillon caused harm to Plaintiffs when he participated in the development of an interim water delivery plan in June 2013, which favored the predominately white Genesee County water users and discriminated against the water users in Flint, a predominantly African American community.

14

45.     Defendant Adam Rosenthal ("Rosenthal") was at all relevant times a Water Quality Analyst assigned to the Lansing District Office of the MDEQ, acting within the scope of his employment and/or authority under color of law.  He is sued herein in his official and individual capacities.  Defendant Rosenthal caused harm to Plaintiffs in that he approved and participated in the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm his department caused Plaintiffs.

46.     Defendant Jeff Wright ("Wright") was at all relevant times the Genesee County Drain Commissioner, acting within the course and scope of his employment and/or authority under color of law.  He is sued in his official and individual capacities.  Defendant Wright caused harm to Plaintiffs when he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment of the United States Constitution.

47.     Defendant Edward Kurtz ("Kurtz") was the Emergency Manager of Flint, appointed by Defendant Snyder in August 2012, and served in this capacity until July 2013.  At all times relevant Defendant Kurtz was acting within the course and scope of his employment and/or authority under color of law.  During his time as emergency manager, Kurtz deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm caused Plaintiffs.  Kurtz also conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and participated in and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as

guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment of the United States Constitution.

48.     Defendant Dayne Walling ("Walling") was Mayor of Flint from August 4, 2009 through November 9, 2015.  At all times relevant Defendant Walling was acting within the course and scope of his employment and/or authority under color of law.  Defendant Walling is liable to Plaintiffs in that he personally approved of, and thereby participated in, the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs.  Walling is also liable in that he conspired with other Defendants to deprive Plaintiffs of their civil and constitutional rights and/or aided and abetted others to violate Plaintiffs' rights to full and equal enjoyment of public services as guaranteed under the ELCRA and the Equal Protection Clause of the 14th Amendment, as well as the 13th Amendment of the United States Constitution.  Additionally, as Mayor, he was a policymaker for Defendant City of Flint within the meaning of *Monell*, and as such his actions constituted customs, policies and/or practices of Defendant City of Flint.

49.     Defendant Daugherty Johnson ("Johnson") was at all relevant times the Utilities Administrator for the City of Flint, acting within the course and scope of his employment and/or authority under color of law.  He is sued in his official and individual capacities.  Defendant Johnson caused harm to Plaintiffs in that he approved of, and thereby participated in the decisions that deliberately created, increased and prolonged the public health crisis at issue in this case and participated in the concealment of the harm he caused Plaintiffs.

## JURISDICTION & VENUE

50.     This Court has jurisdiction over Plaintiffs' 42 U.S.C.  § 1983 claims pursuant to 28 U.S.C.  § 1331, as those claims arise under the Constitution and laws of the United States.  This

Court has jurisdiction over Plaintiffs' remaining claims pursuant to 28 U.S.C. § 1367 because they are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States.

51. This particular action does not present novel or complex issues of State law that predominate over claims for which this Court has original jurisdiction.

52. There are no compelling reasons for declining supplemental jurisdiction over those of Plaintiffs' claims that do not arise under 42 U.S.C. § 1983.

53. All Defendants reside in this district within the meaning of 28 U.S.C. § 1391(c). This Court has personal jurisdiction over all Defendants because a Michigan state court would have personal jurisdiction under MCL 600.701 and MCL 600.705.

54. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b)(1) and (2).

55. Mich. Comp. Laws 600.6440 exempt actions against State agencies from the jurisdiction of the Michigan Court of Claims where the claimant has an adequate remedy in the federal courts.

## **FACTS**

56. The outrageous actions of Defendants in this matter have caused harm to Plaintiffs.

57. The actions of those state employees sued in their individual capacities, acting under color of law, in failing to protect Plaintiffs and then obscuring their mistake as Plaintiffs continued to suffer, constitute gross negligence and/or constitutional violations for which they are not afforded immunity.

58. As a direct and proximate result of Defendants' actions and/or failures to act, Plaintiffs' constitutional and other rights have been violated and they have suffered serious physical, mental, and emotional injury, as well as property damage, as described in this complaint.

**The State of Michigan Completely Overtook and**
**Replaced Flint's Representative City Government**

59.     At all times between December, 2011 and April 30, 2015, the City of Flint was

under the control and authority of an Emergency Manager appointed by, and serving at the

pleasure of, Governor Snyder.

60.     Michael Brown served Governor Snyder as Flint's emergency manager from

December of 2011, until August of 2012.

61.     Ed Kurtz served Governor Snyder as Flint's emergency manager from August of

2012, until July of 2013.

62.     Michael Brown again served Governor Snyder as Flint's emergency manager from

July of 2013, until October of 2013.

63.     Defendant Earley served Governor Snyder as Flint's emergency manager from

October of 2013, until January of 2015.

64.     Defendant Ambrose served Governor Snyder as Flint's emergency manager from

January of 2015, until April 30, 2015.

65.     Therefore, at all relevant times prior to April 30, 2015, Flint's local government

was under the control of the State of Michigan.

**The MDEQ, as a Matter of Pattern, Practice, Custom, and Policy, Has Failed to**
**Adequately Protect Michigan Citizens Against Lead Contaminated Drinking Water**

66.     In 2010, the EPA commissioned a report that indicated problems with the

MDEQ's ability to ensure safe drinking water.

67.     The report noted that funding cuts caused important MDEQ drinking water

positions to be filled "with staff from other programs that have been cut or eliminated ... While

this practice preserves jobs, it decreases the technical knowledge of staff[.]" The report flatly

18

stated that "[t]raining for new staff would also be appreciated on fundamental public health issues and compliance decisions."

68.     The report also indicated a number of technical shortcomings with the way the MDEQ regulated the state's drinking water, particularly as it related to lead contamination.

69.     Specifically, the report noted that while federal regulations require water utilities to certify that the drinking water of 90% of homes in a given community contain no more than 15 parts per billion ("ppb") of lead, MDEQ had a practice of not even calculating "90th percentiles" unless a potential exceedance had been identified.  This "does not meet the requirements of Federal Regulations, since it is required that all 90th percentiles be calculated."

70.     The report also noted that MDEQ did not conduct the required number of water samples for lead, apparently in an effort to conserve agency resources.

71.     Organizational and individual actions and failures of the MDEQ, such as those illustrated in the report, directly resulted in the Flint catastrophe.

### The MDEQ Failed to Take Reasonable Action to Prevent Flint's Residents

72.     The MDEQ failed to require corrosion control for Flint River water from the time Flint began drawing it.

73.     The MDEQ misinformed the EPA about whether corrosion control was being utilized.

74.     The MDEQ improperly conducted sampling, and instead of taking any preventative measures, the MDEQ determined it was sufficient to conduct two rounds of six-month lead sampling, using Flint's residents, including Plaintiffs, as guinea pigs in a process of trial and error.

75.     The first round of lead sampling was conducted between July and December 2014, and the second between January and June 2015.  Despite the fact that the sampling procedures were woefully inadequate, the tests showed rising lead levels in Flint's water.

76.     In conducting the sampling, the MDEQ collected an insufficient number of samples, consistent with MDEQ's pattern, practice, policy, and custom.

77.     Flint's data was essentially useless because the MDEQ failed to require that the appropriate number of samples be drawn from these "high risk" homes.

78.     Because an insufficient number of samples were taken from a pool of homes that were not properly determined to be "high risk," the City of Flint has not had a worthwhile sampling event since the switch to the Flint River.

79.     The MDEQ engaged in a pattern of obfuscation and aggressive denial since the time the source of Flint's water was changed.

80.     At all relevant times, MDEQ and its employees (incorrectly) insisted, despite overwhelming information to the contrary, that it was minimally in compliance with technical rules.  No effort was made to do a single thing more, even when it became obvious that Defendants had created a public health catastrophe, until outside observers forced Defendants into action.

**Under the State's Authority, Flint's Water Supply Was Switched to the Flint River Without the Provision of Any Corrosion Control, Causing Poisonous Lead from Thousands of Pipes to Leach Into Plaintiffs' Drinking Water**

81.     For decades prior to April 25, 2014, the City of Flint received safe, clean, treated drinking water from the Detroit Water and Sewer Department ("DWSD").

82.     In November of 2012, Emergency Manager Ed Kurtz wrote to Treasurer Andy Dillon suggesting that Flint join the yet-to-be-formed Karegnondi Water Authority (KWA) due to cost savings over DWSD.

83.     In April, 2013, Dillon gave Kurtz permission to notify the DWSD that it would be terminating service and switching to the KWA in the coming years.

84.     On April 16, 2013, Kurtz ordered that Flint would switch its long term water supplier from the DWSD to the KWA.

85.     The KWA depended on an infrastructure that had not yet been built.

86.     While waiting for the KWA to come online, the Emergency Manager ordered that instead of temporarily remaining with DWSD, Flint would switch to the Flint River as a temporary source for the City's water.

87.     The temporary use of the Flint River was also designed as a cost-cutting measure.

88.     The Flint River was studied for use as a primary water source in a 2011 feasibility report, of which Defendants were aware.  At that time, the Flint River was rejected because the costs to prepare Flint's water treatment plant to treat Flint River water to applicable standards were estimated to be in the tens of millions of dollars.

89.     On March 7, 2014, Defendant Earley, who had replaced Kurtz, sent a letter to the DWSD stating "[w]e expect that the Flint Water Treatment Plant will be fully operational and capable of treating Flint River water prior to the date of termination.  In that case, there will be no need for Flint to continue purchasing water to serve its residents and businesses after April 17, 2014."

90.     Even Defendant Earley knew that the important limitation was that the treatment plant be ready to treat Flint River water.  The treatment plant was not ready, but he forced the transition through in order to meet the aggressive deadline he had self-imposed to cut costs.

91.     Defendant Michael Glasgow, the water treatment plant's laboratory and water quality supervisor informed the MDEQ on April 16, 2014, that he was "expecting changes to our Water Quality Monitoring parameters … Any information would be appreciated, because it looks as if we will be starting the plant up tomorrow and are being pushed to start distributing water as soon as possible ... I would like to make sure we are monitoring, reporting and meeting requirements before I give the OK to start distributing water."

92.     The next day, Defendant Glasgow wrote to MDEQ, including Defendants Prysby and Busch, noting that he "assumed there would be dramatic changes to our monitoring.  I have people above me making plans to distribute water ASAP.  I was reluctant before, but after looking at the monitoring schedule and our current staffing, I do not anticipate giving the OK to begin sending water out anytime soon.  If water is distributed from this plant in the next couple of weeks, it will be against my direction.  I need time to adequately train additional staff and to update our monitoring plans before I will feel we are ready.  I will reiterate this to management above me, but they seem to have their own agenda."

93.     The rushed nature of the transition to Flint River water is also evident by a request made by Defendant Earley's assistant to the treasury for a contract to be expedited in order to meet the "aggressive timeline" of the switch.

94.     On March 26, 2014, Defendant Busch e-mailed Defendant Shekter-Smith and another colleague the following: "One of the things we didn't get to today that I would like to make sure everyone is on the same page on is what Flint will be required to do in order to start

using their plant full time.  Because the plant is setup for emergency use, they could startup at any time, but starting up for continuous operation will carry significant changes in regulatory requirements so there is a very gray area as to what we consider for startup."

95.    Defendant Ambrose participated in, directed, and/or assented to the decisions to terminate DWSD service and begin premature Flint River water service when he served as a financial advisor to the two Emergency Managers that preceded him.

96.    On April 24, 2014, Daugherty Johnson, Flint's Utilities Administrator, sent an email to Howard Croft, Mike Prysby, and Stephen Bush, stating: "As you are aware, the City has undergone extensive upgrades to our Water Treatment Plant and its associated facilities.  Our intentions and efforts have been to operate our facility as the primary drinking water source for the City of Flint.  Through consultation with your office and our engineering firm we've developed a system of redundant electrical systems, treatment processes and adequate finished water storage[.]"

97.    An April 23, 2014 email from Defendant Busch to Defendant Wurfel developed talking points for an upcoming Flint meeting.  Among them, Busch offers: "While the Department is satisfied with the City's ability to treat water from the Flint River, the Department looks forward to the long term solution of continued operation of the City of Flint Water Treatment Plant using water from the KWA as a more consistent and higher quality source water."

98.    On April 25, 2014, Flint officially began using the Flint River as its primary water source, despite the fact that the proper preparations had not been made.

99.    The same day, then Flint Mayor Dayne Walling publically declared "It's regular, good, pure drinking water, and it's right in our backyard."

100. Flint DPW Director Howard Croft also stated in a press release that "The test results have shown that our water is not only safe, but of the high quality that Flint customers have come to expect. We are proud of that end result." Croft's statement was made despite Mr. Glasgow's known concerns regarding the facility's inadequate preparation and monitoring.

101. This April 25, 2014 transition put Flint in the business of water treatment, where it had previously only been in the business of water distribution, highlighting the need for proper training of employees and analysis of water treatment processes.

102. An important consideration any time a water system changes sources is to account for differences in those sources. According to the EPA, "it is critical that public water systems, in conjunction with their primacy agencies and, if necessary, outside technical consultants, evaluate and address potential impacts resulting from treatment and/or source water changes." Various factors specific to individual water sources necessitate different treatments, including but not limited to the use of chemical additives.

103. Neither the State of Michigan (on its own or through its control over the City of Flint) not the MDEQ, required water quality standards to be set for the Flint River water that would be delivered to Flint's residents. Further, none of them required corrosion control be implemented to ensure that corrosive water was not delivered throughout Flint's aging water system.

104. The MDEQ, as Flint's "primacy agency," was responsible for ensuring that Flint set water quality standards and properly treated its water.

105. The MDEQ, had a duty to recognize the need for corrosion control and advise that it should be implemented.

24

106.    The water obtained from the Flint River was substantially more corrosive than the treated water Flint had been receiving from DWSD.

107.    Water becomes more corrosive when it contains greater quantities of chloride, which can enter the water from manmade and natural sources.

108.    Flint River water is known to contain about 8 times more chloride than the treated water that Flint had been receiving from DWSD.

109.    It is well known that corrosive water that is not properly treated results in the corrosion of pipes, such that the metals in the pipes will leach into drinking water.

110.    Phosphates are often added to corrosive water as a method of corrosion control, to prevent metals from leaching into the water.

111.    Incredibly, at the time of the switch to Flint River water, no phosphates were being added to the water supply.

112.    In fact, nothing whatsoever was being done to account for the corrosive nature of the Flint River water, despite the clear duties of the City of Flint, the MDEQ, and the State as Flint's manager.

113.    As a result of the failure to properly treat water from the Flint River, corrosive water was delivered throughout the Flint Water System.

114.    The corrosive water predictably corroded metal pipes, causing them to leach into water.

115.    The corrosive nature of the water was almost immediately apparent.  Soon after the switch, Flint residents began complaining about discolored water—clearly indicating that iron or other metals were leaching into the water.

116.    It is important that a new source of water be properly studied and treated to ensure that its use will not result in the corrosion of pipes in the delivery system.  This is particularly important where portions of the delivery system, included but not limited to service lines, are made of lead.

117.    An estimated 15,000 of Flint's 30,000 residential service lines are composed at least partially of lead.

118.    Setting standards and optimal ranges for water quality is necessary to prevent widespread impacts from substandard or dangerous water.

119.    Lead is a powerful neurotoxin that can have devastating, irreversible impacts on the development of children.  There is no safe level of lead as its effects are harmful even at low levels?

120.    Lead exposure in children causes heightened levels of lead in the blood and body, resulting in problems including decreased IQ, behavioral problems, hearing impairment, impaired balance and nerve function, infections, skin problems, digestive problems, and psychological disorders.  Lead also causes serious health effects in adults, including digestive, cardiovascular, and reproductive problems, kidney damage, dizziness, fatigue, weakness, depression and mood disorders, diminished cognitive performance, nervousness, irritability, and lethargy.

121.    Lead contamination is not the only problem that is caused when corrosive water is distributed in a public water system.

122.    When water corrodes iron pipes, the iron leaching into the water system can consume chlorine.  This can eliminate the chlorine necessary to prevent the growth of microorganisms that can cause disease.

123.    With chlorine consumed by iron, the risk of infection by organisms such as legionella increases.

124.    Corrosion of iron water pipes is obvious when it occurs, as the water appears discolored.

125.    The corrosion of iron pipes can also result in an increase in water main leaks and breaks.

126.    The signs of iron corrosion are a warning sign that lead corrosion may also be present, since both are caused by the same phenomenon.

127.    Almost immediately after the water source was changed to the Flint River, signs of trouble with Flint's water quality began to surface.

128.    Within weeks, many residents began to complain about odorous, discolored water.

129.    As complaints rolled in, Flint Mayor Walling called the water a "safe, quality product," and claimed that "people are wasting their precious money buying bottled water."

130.    In August and September, 2014, the City of Flint issued two boil water advisories after fecal coliform bacteria were discovered in the water.

131.    On October 13, 2014, General Motors ceased the use of Flint River water at its engine plant because of fears that it would cause corrosion due to high levels of chloride.

132.    Discussing General Motors' decision, Defendant Prysby wrote to Defendants Busch, Shekter-Smith and others that the Flint River water had elevated chloride levels.  He stated that "although not optimal" the water was "satisfactory." He noted that he had "stressed the importance of not branding Flint's water as 'corrosive' from a public health standpoint simply because it does not meet a manufacturing facility's limit for production."

133.    In October of 2014, Governor Snyder received a briefing that blamed iron pipes, susceptible to corrosion and bacteria, for the two boil water advisories.

134.    On January 2, 2015, the City of Flint mailed a notice to its water customers indicating that it was in violation of the Safe Drinking Water Act due to the presence of trihalomethanes, which was a product of attempting to disinfect the water.  It was claimed that the water was safe to drink for most people with healthy immune systems.

135.    On January 9, 2015, the University of Michigan – Flint discovered lead in campus drinking fountains.

136.    With the Flint water quality problems now being recognized, on January 12, 2015, DWSD offered to waive a 4 million dollar reconnection fee to transition back to DWSD water. Defendant Ambrose, as Emergency Manager, declined the offer.

137.    On January 21, 2015, enraged Flint residents attended a meeting a Flint City hall, bringing jugs of discolored water and complaining about the water's smell and taste.

138.    As early as January of 2015, the State of Michigan provided purified water coolers at its Flint offices in response to concerns about the drinking water, while State employees continued for many months to tell the general public that the water was safe to drink.

139.    In a January 29, 2015, e-mail to MDEQ deputy director Jim Sygo, Defendant Shekter-Smith made statements indicating her personal knowledge of the Flint River's corrosivity.  "I'm theorizing here, but most likely what they are seeing is a result of differing water chemistry.  A change in water chemistry can sometimes cause more corrosive water to slough material off of pipes as opposed to depositing material or coating pipes in the distribution system.  This may continue for a while until things stabilize.  It would be unusual for water leaving the plant to have color like people are seeing at their taps.  Generally this is a distribution

system problem or a premise plumbing issues. Since it appears wide-spread, it's most likely a distribution system problem."

140. On February 6, 2015, an Emergency Manager staff member wrote to Defendant Prysby, described as the MDEQ's "most knowledgeable staff member on the Flint and Genesee County water supply issues," asking whether he knew if MDEQ had ever conducted a "source water assessment" for the Flint River. After an initial response stating that he did not know, Prysby later responded that a study on the Flint River as an emergency intake had been conducted in 2004.

141. The 2004 study noted that the Flint River was a highly sensitive drinking water source that was susceptible to contamination, yet apparently even Defendant Prysby did not consult it before approving the Flint River as a source.

142. On February 27, 2015, in response to concerns about extremely high levels of lead in a resident's water sample, Defendant Busch told the EPA on behalf of MDEQ that the Flint Water Treatment Plant had an optimized corrosion control program, despite the fact that it did not.

143. MDEQ was required to know whether Flint had an optimized corrosion control program, because ensuring the existence of that program was the express responsibility of MDEQ.

144. MDEQ did, in fact, know that no optimized corrosion control had been implemented, since MDEQ was involved in the decision not to implement corrosion control.

145. MDEQ did not require the use of corrosion control, and it did not set water quality parameters for the Flint River source water, both of which it was required to do.

29

146. The effect of this inexplicable failure was the exposure of Plaintiffs to poisonous water that caused a wide variety of health effects, including developmental problems in young children.

147. Also on February 27, 2015, the EPA's regional drinking water regulations manager. Miguel Del Toral, began to voice his concerns about the likely cause of the high lead levels detected in Flint. In an email to Defendant Prysby that date (which was also copied to Defendant Busch) Del Toral attributed those levels to particulate lead, which would mean that the MDEQ's testing methods of "pre-flushing" water from homes would bias samples low. He also inquired about optimized corrosion control, which he noted was required that Flint was "required to have" in place.

148. At another point in February, 2015, Governor Snyder received a briefing on Flint's water problems from MDEQ director Dan Wyant, which included resident complaints about discolored, low quality tap water, and a letter from a state representative indicating that his constituents were "on the verge of civil unrest."

149. Snyder took no significant action in response to the Flint residents' pleas.

150. Around the same time, an MDEQ e-mail explained away "hiccups" in the transition to Flint's water system, discounting the possibility of imminent threats to public health, and noting that the switch to the Flint River "put the city in the business of water production, where they had historically been in the business of water transmission." It was claimed that "once the city connects to the new KWA system in 2016, this issue will fade into the rearview."

151. The MDEQ e-mail also noted that "MDEQ approved the use of river as a source[.]"

152.    As evidence of problems mounted, the state and the MDEQ repeatedly denied the dangers facing Flint's residents, insisting that their water was safe to drink.

153.    On March 23-24, 2015, Flint's powerless City Council voted 7-1 to end Flint River service and return to DWSD.  Defendant Ambrose declared that vote "incomprehensible" and rejected the proposal.

154.    Defendant Ambrose then publically declared that "Flint water today is safe by all Environmental Protection Agency and Michigan Department of Environmental Quality standards, and the city is working daily to improve its quality ... water from Detroit is no safer than water from Flint."

155.    On April 24, 2015, the MDEQ finally admitted to the EPA that Flint did not have optimized corrosion control in place, expressly contradicting its statement from two months prior.

156.    By no later than April 2015, but likely much earlier, Defendants Cook, Busch, and Prysby were undeniably aware that no corrosion control was being used in Flint following the switch to the Flint River as the water source.

157.    The MDEQ, Defendants Cook, Busch, and Prysby also knew that at least one EPA employee (EPA Region 5 groundwater and drinking water regulations manager, Miguel Del Toral ("Del Toral")) disagreed with their assertion that the MDEQ was adhering to EPA requirements in its oversight of the water transition.

158.    The flawed interpretation used by MDEQ and its employees amounted to a one year "free pass" for the system, during which Flint's residents would be used as guinea pigs to see whether they should have been protected in the first place.

159.   The MDEQ, Defendants Cook, Busch, and Prysby were expressly told by Del Toral that their sampling procedures skewed lead level results and did not properly account for the presence of lead service lines.

160.   In April 2015, Del Toral issued a memorandum to the MDEQ, stating: "I wanted to follow up on this because Flint has essentially not been using any corrosion control treatment since April 30, 2014, and they have (lead service lines).  Given the very high lead levels found at one home and the pre-flushing happening in Flint, I'm worried that the whole town may have much higher lead levels than the compliance results indicated, since they are using pre-flushing ahead of their compliance sampling."

161.   Del Toral, a national expert in the field, identified the problem, the cause of that problem, and the specific reason the state had missed it.  Defendants ignored and dismissed him.

162.   MDEQ's director, Defendant Wyant, was expressly aware of Del Toral's comments and concerns.

163.   On May 1, 2015, Defendant Cook sent an email to Del Toral disagreeing with Del Toral's interpretation of his own agency's rules and vehemently resisting calls for a water quality.  Cook noted that "[a]s Flint will be switching raw water sources in just over one year from now, raw water quality will be completely different than what they currently use.  Requiring a study at the current time will be of little to no value in the long term control of these chronic contaminants."

164.   Apparently, Defendant Cook and the MDEQ believed they could simply run out the clock on Flint's water quality problem, in conscious disregard for the safety of the public, including Plaintiffs, as the water source would be changing in the near future

165.   Cook also falsely claimed that "the City of Flint's sampling protocols … comply with all current state and federal requirements.  Any required modifications will be implemented at a time when such future regulatory requirements take effect."

166.   While Cook attempted to defend himself and the MDEQ, he completely ignored Del Toral's well-founded concerns that the MDEQ was missing lead in Flint's public drinking water.  Instead, he was focused on insisting that the MDEQ had technically complied with applicable rules.  It had not.

167.   On June 24, 2015, Del Toral authored an alarming memorandum to Thomas Poy, the chief of the EPA's Region 5 Ground Water and Drinking Water Branch, more fully stating his concerns about the problems with MDEQ's oversight of Flint (the "Memorandum").

168.   Del Toral's Memorandum noted that Flint was not providing corrosion control treatment, "[a] major concern from a public health standpoint." Further, "[r]ecent drinking water sample results indicate the presence of high lead results in the drinking water, which is to be expected in a public water system that is not providing corrosion control treatment.  The lack of any mitigating treatment for lead is of serious concern for residents that live in homes with lead service lines or partial lead service lines, which are common throughout the City of Flint."

169.   The Memorandum additionally noted that, "[t]he lack of mitigating treatment is especially concerning as the high lead levels will likely not be reflected in the City of Flint's compliance samples due to the sampling procedures used by the City of Flint for collecting compliance samples ... This is a serious concern as the compliance sampling results which are reported by the City of Flint to residents could provide a false sense of security to the residents of Flint regarding lead levels in their water and may result in residents not taking necessary

precautions to protect their families from lead in the drinking water ... [o]ur concern ... has been raised with the [MDEQ]."

170.    Del Toral's Memorandum also noted that a Flint resident, Lee-Anne Walters, who had directly contacted the EPA had alarming results of 104 ug/L and 397 ug/L1, especially alarming given the flawed sampling procedures used by the MDEQ.  The MDEQ had told the resident that the lead was coming from the plumbing in her own home, but Del Toral's inspection revealed that her plumbing was entirely plastic.

171.    The memorandum also noted blood tests showed Ms.  Walters's child had elevated blood lead levels, and that additional sample results from resident-requested samples showed high levels of lead.

172.    Among those cc'd on the Memorandum was Defendants Liane Shekter-Smith, Patrick Cook, Stephen Busch, and Michael Prysby.

173.    On May 11, 2015, Jon Allan, director of the Michigan Office of the Great Lakes, e-mailed Defendant Shekter-Smith for her reactions to the following language in a proposed report "By 2020, 98 percent of population served by community water systems is provided drinking water that meets all health-based standards ... By 2020, 90 percent of the non-community water systems provide drinking water that meets all health-based standards." Responding the same day, MDEQ Water Resources Division Chief William Creal replied: "I think you are nuts if you go with a goal less than 100 percent for (drinking water) compliance in the strategy.  How many Flints to you intend to allow???"

174.    Defendant Shekter-Smith responded the next day: "The balance here is between what is realistic and what is ideal.  Of course, everyone wants 100 percent compliance.  The reality, however, is that it's impossible.  It's not that we 'allow' a Flint to occur; circumstances

happen.  Water mains break, systems lose pressure, bacteria gets into the system, regulations change and systems that were in compliance no longer are, etc.  Do we want to put goal in black and white that cannot be met but sounds good? Or do we want to establish a goal that challenges us but can actually be accomplished? Perhaps there's a middle ground?"

175.    Defendant Shekter-Smith's May 12, 2015 email comments reflect her obvious awareness at that time that Flint's water did not meet health based standards, and her callous "circumstances happen" statement demonstrated her deliberate indifference to the results.

176.    In approximately July 2015, Defendant Busch claimed that "almost all" homes in the pool sampled for lead in Flint had lead service lines.  This was patently untrue and was made with no basis in fact, and the effect of this mistake made the lead testing results even more unreliable.  Busch knew that this statement was not true, because Flint's records available at that time were insufficient to allow him to make such a determination.

177.    On July 9, 2015 ACLU-Michigan reporter Curt Guyette publicly broke the story about lead in Flint's drinking water, citing Del Toral's Memorandum and exposing the lack of corrosion control in Flint's drinking water.

178.    Four days later, Defendant Wurfel issued the following public statement: "Let me start here- anyone who is concerned about lead in the drinking water in Flint can relax."

179.    On July 21, 2015, the EPA, on a conference call with MDEQ, pushed for optimized corrosion control (which MDEQ had previously falsely told the EPA that Flint was using), while MDEQ claimed it was unnecessary and premature.

180.    MDEQ could not have been more wrong.  Far from being premature, it was already too late to fully protect the people of Flint.

181.   On July 22, 2015, Governor Snyder's chief of staff, Dennis Muchmore, sent an email indicating his awareness of the problems with Flint's water and the state's inadequate response.  He noted: "I'm frustrated by the water issue in Flint.  I really don't think people are getting the benefit of the doubt.  Now they are concerned and rightfully so about the lead level studies they are receiving from DEQ samples.  Can you take a moment out of your impossible schedule to personally take a look at this? These folks are scared and worried about the health impacts and they are basically getting blown off by us (as a state we're just not sympathizing with their plight)."

182.   Linda Dykema, director of the MDHHS Division of Environmental Health sent an email to a number of department employees attempting to discredit Del Toral, who to this point was the only government employee actively trying to protect Flint's residents, including Plaintiffs, from lead poisoning.  She claimed "[r]egarding the EPA drinking water official quoted in the press articles, the report that he issued was a result of his own research and was not reviewed or approved by EPA management.  He has essentially acted outside his authority."

183.   On July 24, 2015, Defendant Wurfel wrote an e-mail to Defendants Busch, Prysby, Shekter-Smith and Wyant, stating: "Guys, the Flint Ministers met with the Governor's office again last week.  They also brought along some folks from the community – a college prof and GM engineer – who imparted that 80 water tests in Flint have shown high lead levels.  Could use an update on the January/June testing results, as well as recap of the December testing numbers, and any overview you can offer to edify this conversation."

184.   Defendant Busch responded the same day in email to Defendant Wurfel copied to all others on the original e-mail, claiming that the second round of Flint drinking water testing showed a 90th percentile level of 11 parts per billion, almost double the prior round's results.

Even with MDEQ's terribly flawed sampling methods showing that lead levels had nearly doubled since the first six month testing, and even with outside evidence of even higher levels, Defendants showed no concern and took no immediate action to protect the people of Flint, including Plaintiffs.

185.    Defendant Busch also noted in his e-mail that Flint would be completing a study (within 18 months) and are allowed a period of additional time (2 additional years) to install the selected treatment for fully optimized corrosion control.

186.    MDEQ and its employees would have allowed the continued poisoning of Flint's residents, including Plaintiffs, over three more years without even attempting to reduce the water's corrosiveness.

187.    On July 24, 2015, Defendant Wurfel wrote the following to recipients including Mr. Muchmore and Defendant Wyant: "Guys, here's an update and some clarification on the lead situation in Flint. Please limit this information to internal for now ... By the tenants of the federal statute, the city is in compliance … That aside, they have not optimized their water treatment ... Conceivably, by the time we're halfway through the first timeline, the city will begin using a new water source with KWA ... and conceivably, the whole process starts all over again. In terms of near-future issues, the bottom line is that residents of Flint do not need to worry about lead in their water supply, and DEQ's recent sampling does not indicate an eminent [sic] health threat[.]"

188.    In August, 2015, the EPA pressed MDEQ to move faster on implementing corrosion control in Flint.

189.    On August 23, 2015, Virginia Tech Professor Marc Edwards wrote MDEQ to inform them that he would be conducting a study of Flint's water quality.

190.    On August 27, 2015, Professor Edwards's preliminary analysis was released. More than half of the first 48 samples he tested came back above 5 ppb, and more than 30% of them came back over 15 ppb, which would be unacceptable even as a 90th percentile.  He called the results "worrisome."

191.    In an e-mail response to a Governor's office inquiry regarding the high lead levels in residents' homes and the discrepancy between those numbers and the state's test results, Defendant Wurfel stated "[d]on't know what it is, but I know what it's not.  The key to lead … in drinking water is that it's not the source water, or even the transmission lines (most of which are cast iron).  It's in the premise plumbing (people's homes)."

192.    This statement was made despite the facts that about half of Flint's homes are connected to lead service lines, and that it was clear by this point that Ms.  Walters's home had plastic plumbing.

193.    Wurfel then blamed Del Toral, the ACLU, and others taking action to help Flint's residents, stating: "This person is the one who had EPA lead specialist come to her home and do tests, then released an unvetted draft of his report (that EPA apologized to us profusely for) to the resident, who shared it with ACLU, who promptly used it to continue raising hell with the locals ... [I]t's been rough sledding with a steady parade of community groups keeping everyone hopped-up and misinformed."

194.    On August 28, 2015, an EPA employee notified Defendant Shekter-Smith and other MDEQ employees that "Marc Edwards (Virginia Tech) is working with some of the citizens in Flint and they are finding lead at levels above five parts per billion and some above 15 parts per billion.  There's no indication of whether any of these homes were also sampled and

analyzed by Flint and will now be part of their compliance calculations.  Virginia Tech sent out 300 bottles and has gotten 48 back.  We are not involved in this effort by Dr.  Edwards."

195.    On September 2, 2015, Defendant Wurfel engaged in further efforts to discredit Marc Edwards, this time in a press release.  He stated: "[W]e want to be very clear that the lead levels being detected in Flint drinking water are not coming from the treatment plant or the city' transmission lines ... The issue is how, or whether, and to what extent the drinking water is interacting with lead plumbing in people's homes ... the results reported so far fail to track with any of the lead sampling conducted by the city.  In addition, Virginia Tech results are not reflected by the blood lead level testing regularly conducted by the state department of community health that have not shown any change since Flint switched sources."

196.    Defendant Wurfel knew this statement to be false, or had no reason to believe that it was true.  For example, it was obvious by this point that Ms.  Walters's home had plastic plumbing.

197.    On September 6, 2015, another Wurfel attempt to discredit Edwards's results was published through Michigan Public Radio: "The samples don't match the testing that we've been doing in the same kind of neighborhoods all over the city for the past year.  With these kinds of numbers, we would have expected to be seeing a spike somewhere else in the other lead monitoring that goes on in the community."

198.    Tragically, had the MDEQ or MDHHS been doing their jobs, they would indeed have seen spikes in all other forms of lead monitoring.  Even worse, the MDEQ had been told exactly why its testing failed to reveal extremely high levels of lead.

199.    Dr.  Edwards published a report in early September, 2015, with startling findings. Among them: "FLINT HAS A VERY SERIOUS LEAD IN WATER PROBLEM"; "101 out of

252 water samples from Flint homes had first draw lead more than 5 ppb"; "Flint's 90th percentile lead value is 25 parts per billion ... over the EPA allowed level of 15ppb that is applied to high risk homes ... Several samples exceeded 100ppb and one sample collected after 45 seconds of flushing exceeded 1,000 ppb[.]"

200.    Additional Edwards findings included that "[o]n average, Detroit water is 19 times less corrosive than the Flint River water currently in use"; "even with phosphate, Flint River water has 16 times more lead compared to the same condition using Detroit water."

201.    Therefore, the Flint River water was so corrosive that even the obvious, necessary measure of adding corrosion control may not have been enough to make it totally safe

202.    This would have been known if the water were properly treated or studied before the switch.  Instead, by and through the actions of Defendants herein, the residents of Flint, including Plaintiffs, were used as guinea pigs in a "test then treat" scenario that ensured at least one year of absolutely no protection from lead contamination.

203.    Edwards predicted that "in the weeks and months ahead MDEQ and Flint will be forced to admit they failed to protect public health[.]"  He was entirely correct.

204.    Another scurrilous attack by Defendant Wurfel on Professor Edwards and his team occurred on September 9, 2015, when Wurfel told a reporter: "[T]he state DEQ is just as perplexed by Edwards's results as he seems to be by the city's test results, which are done according to state and federal sampling guidelines and analyzed by certified labs."

205.    This statement by Defendant Wurfel was made with full knowledge that at least one EPA employee had told MDEQ that its testing was not being conducted according to federal guidelines.

206.   Defendant Wurfel also claimed that Professor Edwards' team "only just arrived in town and (have) quickly proven the theory they set out to prove, and while the state appreciates academic participation in this discussion, offering broad, dire public health advice based on some quick testing could be seen as fanning political flames irresponsibly."

207.   Again, Wurfel and MDEQ publically attempt to discredit the people working to protect the public, including Plaintiffs, while providing false assurances to Flint's residents, including Plaintiffs, about the water that continues to poison them.

208.   On September 10, 2015, Dr. Yanna Lambrinidou, high ranking official with the EPA, wrote to Defendants Wurfel and Busch, requesting information on "optimal water quality parameter ranges" that MDEQ should have set for Flint's water.  However, no such information existed, because MDEQ had never created it.

209.   Busch responded "[a]ll previous water quality parameter ranges would have been established for the City of Flint's wholesale finished water supplier, the Detroit Water and Sewerage Department, not the City of Flint itself.  As the City of Flint has not yet established optimized corrosion control treatment, the MDEQ is not yet at the point of regulatory requirements where the range of water quality parameters would be set."

210.   Water quality parameter ranges ensure safe levels of things like PH, nitrates, and phosphates.

211.   Dr. Lambrinidou replied "Do you mean that MDEQ never set optimal water quality parameter ranges specifically for Flint before Flint's switch to Flint River water?"

212.   Busch's response reiterated his contention that Flint was not required to implement corrosion control until unacceptably high levels of lead had already appeared in the water.  This

callous response, on September 25, 2015, indicated Busch's deliberate indifference to the health and welfare of Flint's residents, including Plaintiffs.

213. A September 10 e-mail from the EPA's Jennifer Crooks to Defendant Shekter-Smith, summarizing an apparent EPA-DEQ conference call, acknowledged that Professor Edwards's study "[was] putting added pressure on MDEQ, and EPA to ensure that Flint addresses their lack of optimized corrosion control treatment in an expedited manner in order to protect the residents from exposure to high lead levels." Further, "EPA acknowledged that to delay installation of corrosion control treatment in Flint would likely cause even higher levels of lead over time as Flint's many lead service lines are continuously in contact with corrosive water."

214. In a September 17, 2015 letter, Defendant Wyant wrote a letter in response to an inquiry from various legislators, disavowing any responsibility for reacting to Del Toro's alarm-sounding Memorandum: "With respect to the draft memo referenced in your letter, the MDEQ does not review or receive draft memos from the USEPA, nor would we expect to while it is a draft."

215. Wyant's statement was made despite the fact that he and the MDEQ were fully aware of Del Toral's Memorandum and the concerns it raised, and as though this apparent MDEQ policy justified ignoring Del Toral.

216. On September 15, 2015, MLive published an article entitled "Virginia Tech professor says Flint's tests for lead in water can't be trusted." Edwards is quoted as recommending a return to DWSD, stating "Flint is the only city in America that I'm aware of that does not have a corrosion control plan in place to stop this kind of problem."

217. On September 23, 2015, an e-mail from Defendant Croft to numerous officials included the following: "I am pleased to report that the City of Flint has officially returned to

compliance with the Michigan Safe Drinking Water Act and we have received confirming documentation from the DEQ today ... Recent testing has raised questions regarding the amount of lead that is being found in the water and I wanted to report to you our current status. At the onset of our plant design, optimization for lead was addressed and discussed with the engineering firm and with the DEQ. It was determined that having more data was advisable prior to the commitment of a specific optimization method. Most chemicals used in this process are phosphate based and phosphate can be a 'food' for bacteria. We have performed over one hundred and sixty lead tests throughout the city since switching over to the Flint River and remain within EPA standards."

218. Defendant Croft's statement was made despite his knowledge that the samples the city had taken were insufficient to draw any conclusions

219. Defendant Croft's widely disseminated message makes no mention of the flawed lead testing results.

220. On September 25, 2015, Snyder Chief of Staff Dennis Muchmore sent an e-mail to Governor Snyder and others that treated the situation in Flint as a political inconvenience instead of a humanitarian crisis. He stated: "The DEQ and [MDHHS] feel that some in Flint are taking the very sensitive issue of children's exposure to lead and trying to turn it into a political football claiming the departments are underestimating the impacts on the populations and are particularly trying to shift responsibility to the state ... I can't figure out why the state is responsible except that Dillon did make the ultimate decision so we're not able to avoid the subject. The real responsibility rests with the County, city, and KWA[.]"

221. In addition to ignoring the fact that the state had taken over Flint, Muchmore's evasion of state responsibility ignores the role of the MDEQ and MDHHS in this crisis.

222.    Where MDEQ caused, obscured, and lied about the lead problem, MDHHS should have discovered and revealed it.

223.    Instead, the MDHHS obscured, obfuscated, and intentionally withheld information which conclusively showed that the children of Flint were being poisoned.  It took the work of an outside doctor to force MDHHS to acknowledge its failures.

224.    While MDEQ ignored and criticized the very people it should have been gratefully listening to in Del Toral and Dr.  Edwards, the MDHHS extended the same treatment to Dr. Mona Hanna-Attisha, a pediatrician at Flint's Hurley Hospital.

225.    In a July 28, 2015, email from MDHHS epidemiologist Cristin Larder to MDHHS employees Nancy Peeler and Patricia McKane, Larder identifies an increase in blood lead levels in Flint just after the switch to river water, and concludes only that the issue "warrant[s] further investigation."

226.    On the same day, Nancy Peeler sent an e-mail admitting an uptick in children with elevated blood lead levels in Flint in July, August, and September 2014, but attributing it to seasonal variation.

227.    MDHHS took no actions as outsiders began to discover and reveal Flint's lead problem.  Instead, it withheld data and obstructed those researchers while actively attempting to refute their findings.

228.    In a September 10, 2015, e-mail from MDHSS health educator Michelle Bruneau to colleague Kory Groestch, regarding a talking points memorandum, she states: "[M]ay be a good time to float the draft out to the others because if we're going to take action it needs to be soon before the Virginia Tech University folks scandalize us all."

229.    Again, instead of acting to help the people of Flint, including Plaintiffs, the State and its employees were concerned with protecting themselves.

230.    In a September 11, 2015, e-mail to Linda Dykema and Kory Groestch of the MDHHS, Defendant Shekter-Smith wrote: "Since we last spoke, there's been an increase in the media regarding lead exposure.   Any progress developing a proposal for a lead education campaign? We got a number of legislative inquiries that we are responding to.   It would be helpful to have something more to say." DHHS's Bruneau responded to Groetsch: "Told ya," and incredibly, includes a "smiley face" emoticon.

231.    Groetsch then responds to Shekter-Smith that Bruneau has written only "the bones" of a health education and outreach plan.

232.    The same day, Robert Scott, the data manager for the MDHHS Healthy Homes and Lead Prevention program, was e-mailed a copy of a grant proposal for Professor Edwards's study Edwards's grant proposal described a "perfect storm" of "out of control" corrosion of city water pipes leading to "severe chemical/biological health risks for Flint residents." Scott forwarded the grant proposal to MDHHS employees Nancy Peeler, Karen Lishinski, and Wesley Priem, with the note"[w]hen you have a few minutes, you might want to take a look at it.  Sounds like there might be more to this than what we learned previously.  Yikes!"

233.    On September 22, 2015, MDHHS Environmental Public Health Director Lynda Dykema, emailed MDHHS' Geralyn and Defendant Peeler, among others.  She stated: "Here is a link to the VA Tech study re city of Flint drinking water ... It appears that the researchers have completed testing of a lot of water samples and the results are significantly different than the city and DEQ data.  It also appears that they've held public meetings in Flint, resulting in concerns about the safety of the water that have arisen in the last few days."

234.    On the same day, Dr.  Mona Hanna-Attisha requested from Robert Scott and others at MDHHS full state records on blood tests, likely to compare to her own data.  She notes "[s]ince we have been unable to obtain recent MCIR blood lead data for Flint kids in response to the lead in water concerns, we looked at all the blood lead levels that were processed through Hurley Medical Center[.]" She tells the MDHHS that despite being denied data access from the state, she has found "striking results."

235.    Dr.  Hanna-Attisha had heard complaints from Flint residents about their water and found out that no corrosion control was being used.  She developed a study using her hospital's data, comparing lead levels in blood samples taken before and after the switch in the water supply.

236.    On September 24, 2015, Dr.  Hanna-Attisha released a study showing post-water-transition elevated blood-lead levels in Flint children at a press conference.  Dr.  Hanna-Attisha had essentially done the job that the MDHHS should have done.

237.    Earlier that day, MDHSS employee Angela Minicuci circulated a memorandum of "Flint Talking Points" in anticipation of Dr.  Hanna-Attisha's study.  It noted that her results were "under review" by MDHHS, but that her methodology was different, implying that her methodology was unorthodox or improper.  "Looking at the past five years as a whole provides a much more accurate look at the season trends of lead in the area," MDHHS claimed.  "MDHHS data provides a much more robust picture of the entire blood lead levels for the Flint area."

238.    Also regarding Dr.  Hanna-Attisha's findings, Governor Snyder's press secretary e-mailed a number of state employees the following: "Team, [h]ere's the data that will be presented at the Hurley Hospital press conference at 3 p.m.  As you'll see, they are pointing to

46

individual children, a very emotional approach. Our challenge will be to show how our state data is different from what the hospital and the coalition members are presenting today."

239. Here again, the State and the individual Defendants in this action were more concerned about protecting their own respective reputations than the lives of Flint residents, including Plaintiffs. It never addressed the most important-- and obvious question-- what if Dr. Hanna Attisha was right?

240. MDHHS employees were uniformly dismissive of Dr. Hanna-Attisha's results. Wesley Priem, manager of the MDHHS Healthy Homes Section, wrote to MDHHS' Kory Groetsch: "This is definitely being driven by a little science and a lot of politics."

241. The same day the results were released, Robert Scott emailed Nancy Peeler, noting that he had tried to "recreate Hurley's numbers," and says he sees "a difference between the two years, but not as much difference as they did." Despite the fact that this constitutes MDHHS's first internal recognition that their own methodology could have been wrong and that Flint children had been poisoned, Scott added "I'm sure this one is not for the public."

242. As this was going on, Professor Edwards forcefully requested blood lead data from Mr. Scott. In an email, the Professor notes that the State had failed to provide the records to Dr. Hanna-Attisha's team, and accused the MDHHS of "raising ... obstacles to sharing it with everyone who asks." Professor Edwards claims to have been requesting the data since August, and notes that he has sent Scott ten e-mails on the subject.

243. The next day, Scott drafted a remarkable response, but never sent it to Professor Edwards on the advice of Defendant Peeler. Included in the would-be response: "I worked with you earlier this month to get data to you relatively quickly but did not manage to complete the

process before I went on annual leave for several days. I neglected to inform you that I'd be away, and I apologize for not informing you."

244. Despite the fact that Scott admitted to going on vacation and leaving an important task unfinished as a public health crisis unfolded, Peeler tells him to "apologize less."

245. The day after Dr. Hanna-Attisha releases her study, the City of Flint issues a health advisory, telling residents to flush pipes and install filters to prevent lead poisoning.

246. The same day, Robert Scott responded to an email from colleagues about Detroit Free Press interest in doing a lead story. At 12:16 p.m., Free Press reporter Kristi Tanner sent an email to Angela Minicuci at MDHHS saying Tanner had looked at the lead increase in Flint as shown in DHS records between 2013-2014 and 2-14-2015 and Tanner is concluding that the increase "is statistically significant."

247. Scott writes to Minicuci: "The best I could say is something like this: 'While the trend for Michigan as a whole has shown a steady decrease in lead poisoning year by year, smaller areas such as the city of Flint have their bumps from year to year while still trending downward overall.'"

248. Nancy Peeler, also a party to the conversation, writes back to Scott and Minicuci: "My secret hope is that we can work in the fact that this pattern is similar to the recent past."

249. This conversation unfolded the very day after Scott told Peeler that his own review of the data showed increased post-switch lead levels, but that his findings were not to be made public.

250. Peeler and Scott intentionally withheld information that they had a duty to disclose to the public, and actively sought to hide the lead poisoning epidemic that they had previously failed to discover.

251.    Also on September 25, MDHHS's Lasher sent an email to Mr.  Muchmore, Defendant Wyant, Defendant Wurfel, and others, repeating criticisms of Dr.  Hanna-Attisha's findings using quotation marks in reference to the "data" that she reviewed and calling her sample size into question.

252.    Those MDHHS employees not actively engaged in the cover-up showed no urgency whatsoever to this public health crisis.  Cristin Larder sent an e-mail to a number of colleagues: "After looking at the data Kristi send you and talking with Sarah, I realize I do not have access to the data I need to answer her specific question about significance.  I won't be able to get access before Monday.  Sorry I wasn't able to be helpful right now." Angela Minicuci responded: "Not a problem, let's connect on Monday."

253.    The MDHHS apparently could not be troubled with an ongoing public health emergency on the weekend.

254.    As this crisis unfolded, Governor Snyder received briefings from Mr.  Muchmore, which were more focused on political reputation preservation than helping the people of Flint, including Plaintiffs.

255.    Muchmore referred to the people raising concerns about Flint's lead as the "anti-everything group," and claimed that it was the responsibility of the City of Flint (overtaken by Snyder's Emergency Manager) to "deal with it." Still, by September 26, 2015, Muchmore had told the governor that finding funds "to buy local residents home filters is really a viable option," and had identified service lines to homes as a likely cause of the problem.

256.    The Governor took no immediate action to protect the rights, health, and safety of Flint's residents while his subordinates continued to insist that the water was safe and discredit those who presented evidence to the contrary.

257.   On September 28, 2015, another incredible Defendant Wurfel public statement was released.  He claimed that the Flint situation is turning into "near hysteria," and saying of Dr. Hanna-Attisha's statements "I wouldn't call them irresponsible.  I would call them unfortunate." He again declares Flint's water safe.

258.   On September 28, 2015, State Senator Jim Ananich sent a letter to Governor Snyder, noting "[i]t is completely unacceptable that respected scientific experts and our trusted local physicians have verified that the City of Flint's drinking water is dangerous for our citizens, especially our most vulnerable young people." He called for immediate action, but the Governor continued to wait.

259.   The same day, MDHHS Director Nick Lyon continues trying to discredit Dr. Hanna-Attisha's study despite his own department's knowledge that it shows a real problem.  In an e-mail, he stated: "I need an analysis of the Virginia Tech/Hurley data and their conclusions.  I would like to make a strong statement with a demonstration of proof that the lead blood levels seen are not out of the ordinary and are attributable to seasonal fluctuations.  Geralyn is working on this for me but she needs someone in public health who can work directly with her on immediate concerns/questions."

260.   Incredibly, and in blatant violation of state law, at all relevant times the state's "top doctor," MDHHS chief medical executive Dr.  Eden Wells was attending to her responsibilities part time while also working at the University of Michigan.  Dr.  Wells did not become a full time state employee until February 1, 2016, and her mandatory responsibilities at the state prior to that time may have involved as little as eight (8) hours per week.

261.   Dr.  Wells was the sole medical doctor working as an executive for the department.

262.   Dr. Wells' predecessor, Dr. Gregory Holtzman, has noted that as a full time employee, he "kept quite busy."

263.   Other outsiders continued to put pressure on the MDHHS to be more transparent. Genesee County Health Officer Mark Valacak wrote an e-mail to department employees, demanding "to know whether you have confirmed with the lead program staff at MDHHS that he state results that purport that lead levels have not shown a significant increase since the changeover of the water supply for the city of Flint indeed represent Flint city zip codes only and not Flint mailing addresses.  As I mentioned to you both this morning, Flint mailing addresses include outlying areas like Flint and Mundy Townships which obtain their water from the Detroit water authority."

264.   Valacak's email pointed out further flaws in MDHHS methodology.

265.   In the face of continued state denials, a September 29, 2015, article in the Detroit Free Press publically claimed "Data that the State of Michigan released last week to refute a hospital researcher's claim that an increasing number of Flint children have been lead-poisoned since the city switched its water supply actually supports the hospital's findings, a Free Press analysis has shown.  Worse, prior to the water supply change, the number of lead-poisoned kids in Flint, and across the state, had been dropping; the reversal of that trend should prompt state public health officials to examine a brewing public health crisis."

266.   Dr. Hanna-Attisha could see the problem and the Free Press could see the problem with the state's own data, and yet the MDHHS found signs of a lead problem but ignored it.

267.   Finally, Governor Snyder was forced to admit that there was an emergency he could no longer ignore.  His Executive Director sent an e-mail on September 29, 2015 to Mr.

51

Muchmore, Nick Lyon, and Defendant Wyant, among others, soliciting information for a meeting regarding emergency management and noting that Dr. Wells "should be speaking with Hurley."

268. A September 29, 2015, internal e-mail between MDHHS employees refers to the situation in Flint as sounding "like a third world country" and openly wondering when the federal government might be able to step in.

269. The same day, MDHHS employees discuss efforts made by Genesee County to obtain MDHHS data. Ms. Lasher writes "I understand that we are still reviewing the data – but the County has basically issued a ransom date that they want this information by tomorrow ... Eden – please coordinate an answer so Nick can walk into the 1 p.m. (meeting with the governor) prepared on this."

270. As demonstrated in Ms. Lasher's email, the state continued to refuse to take even the simplest measure to protect public health until outsiders forced it to do so.

271. Also on September 29, 2015, Geralyn Lasher e-mailed Defendants Peeler and Wells, Scott, and several others at MDHHS: "Is it possible to get the same type of data for just children under the age of six? So basically, the city of Flint kids ages six and under with the same type of approach as the attached chart you gave us last week?"

272. Linda Dykema responds to fellow MDHHS employees including Defendant Wells: "[i]t's bad enough to have a data war with outside entities, we absolutely cannot engage in competing data analyses within the Department, or, heaven forbid, in public releases."

273. Defendant Wells' only reply to that email was a single word: "Agree," showing MDHHS continuing efforts to mislead the public, protect itself, and discredit Dr. Hanna-Attisha.

274. The MDHHS and its employees were completely disinterested in the truth or finding out whether it may have made an error.

275. When Dr. Hanna-Attisha directly e-mailed Defendant Wells with updated findings that isolated certain high risk areas of the city and showed that blood lead levels have "more than tripled," Defendant Wells responded that the state was working to replicate Hanna-Attisha's analysis, and inquired about Dr. Hanna-Attisha's plans to take the information public.

276. While discouraging her department to look further into Dr. Hanna-Attisha's findings and misleading Dr. Hanna-Attisha, Defendant Wells remained focused on a single task; saving face at the expense of Flint's residents.

277. Also on September 29, 2015, Genesee County issued its own health advisory about Flint's water. Two days later, the County warned Flint residents not to drink the water.

278. As the lead crisis unfolded, the State also obscured the cause of Flint's Legionnaires' disease outbreak. Because of the common cause, the lack of corrosion control, this effort further hindered outside efforts with respect to the lead problem.

279. The state actively prevented interested federal officials from becoming involved in the Legionnaires' investigation.

280. A Centers for Disease Control and Prevention ("CDC") employee wrote to Genesee County Health officials in April of 2015: "We are very concerned about this Legionnaires' disease outbreak ... It's very large, one of the largest we know of in the past decade, and community-wide, and in our opinion and experience it needs a comprehensive investigation."

281. That e-mail added "I know you've run into issues getting information you've requested from the city water authority and the MI Dept. of Environmental Quality. Again, not knowing the full extent of your investigation it's difficult to make recommendations, and it may be difficult for us to provide the kind of detailed input needed for such an extensive outbreak from afar."

282.    On December 5, 2015, an employee of Genesee County Health Department accused state officials of covering up their mishandling of Flint's Legionnaires' disease outbreak. Tamara Brickey wrote to colleagues that "[t]he state is making clear they are not practicing ethical public health practice." Further, "evidence is clearly pointing to a deliberate cover-up," and "[i]n my opinion, if we don't act soon, we are going to become guilty by association."

283.    On October 1, 2015, the MDHHS officially confirmed Dr.   Hanna-Attisha's results.  Department employees developed a "talking points" memorandum that gently admitted that further analysis of their own data supported the doctor's findings, but cited lead paint as a greater concern than the water.

284.    Finally, after months of denial, obstruction, and lies, the State began to act on October 12, 2015.  Governor Snyder received a proposal to reconnect Flint to DWSD and worked on plans for lead testing and water filters.  Still, Governor Snyder's "comprehensive action plan" stated that "[t]he water leaving Flint's drinking water system is safe to drink, but some families with lead plumbing in their homes or service connections could experience higher levels of lead in the water that comes out of their faucets."

285.    Subsequent tests have shown that lead levels in Flint's water have been so high that filters could not remove all lead, meaning that the state's recommendation and distribution of filters as a solution continued to inflict harm.

286.    On October 16, 2015, Flint reconnected to DWSD.  However, the damage had been done and lead has continued to leach from pipes into the water.

287.    Two days later Defendant Wyant admitted the colossal failure that his department had made, many months after it was expressly brought to their attention.   Wyant informed Governor Snyder that "staff made a mistake while working with the City of Flint.  Simply stated,

staff employed a federal (corrosion control) treatment protocol they believed was appropriate, and it was not." Also; "simply said, our staff believed they were constrained by two consecutive six-month tests. We followed and defended that protocol. I believe now we made a mistake. For communities with a population above 50,000, optimized corrosion control should have been required from the beginning. Because of what I have learned, I will be announcing a change in leadership in our drinking water program."

288. Defendant Wyant admitted to the Detroit News that MDEQ's "actions reflected inexperience, and our public response to the criticism was the wrong tone early in this conversation."

289. Apparently, by "early in this conversation," Wyant meant "until today." On October 21, 2015, Governor Snyder appointed a five person task force to investigate the Flint water crisis. The task force included Ken Sikkema, senior policy fellow at Public Sector Consultants, Chris Kolb, president of the Michigan Environmental Council, Matthew Davis, a professor of pediatrics and internal medicine at the University of Michigan, Eric Rothstein, a private water consultant, and Lawrence Reynolds, a Flint pediatrician. The day before the task force's findings were released, Snyder's new chief of staff wrote to him that "[i]f this is the path that the Task Force is on, it is best to make changes at DEQ sooner rather than later. That likely means accepting Dan's resignation. It also means moving up the termination of the 3 DEQ personnel previously planned for Jan 4 to tomorrow."

290. On December 29, 2015, the task force issued a letter detailing its findings.

291. In that letter, the task force stated that "[w]e believe the primary responsibility for what happened in Flint rests with the Michigan Department of Environmental Quality (MDEQ). Although many individuals and entities at state and local levels contributed to creating and

prolonging the problem, MDEQ is the government agency that has responsibility to ensure safe drinking water in Michigan.  It failed in that responsibility and must be held accountable for that failure."

292.    The task force letter continued: "The Safe Drinking Water Act (SDWA) places responsibility for compliance with its requirements on the public water system.  In this instance, the City of Flint had the responsibility to operate its water system within SDWA requirements, under the jurisdiction of the MDEQ.  The role of the MDEQ is to ensure compliance with the SDWA through its regulatory oversight as the primary agency having enforcement responsibility for the Flint water system."

293.    The letter pointed to a "minimalist approach to regulatory and oversight authority" at MDEQ's Office of Drinking Water and Municipal Assistance (headed by Defendant Shekter-Smith) which "is unacceptable and simply insufficient to the task of public protection.  It led to MDEQ's failure to recognize a number of indications that switching the water source in Flint would-and did- compromise both water safety and water quality."

294.    The letter also noted that "[t]hroughout 2015, as the public raised concerns and as independent studies and testing were conducted and brought to the attention of MDEQ, the agency's response was often one of aggressive dismissal, belittlement, and attempts to discredit these efforts and the individuals involved."

295.    Further, that "the MDEQ seems to have been more determined to discredit the work of others – who ultimately proved to be right – than to pursue its own oversight responsibility."

296.    Regarding other failures of the state, the task force report noted that "we are particularly concerned by recent revelations of MDHHS's apparent early knowledge of, yet silence about, elevated blood lead levels detected among Flint's children."

297.    "The City of Flint's water customers – fellow Michigan citizens – were needlessly and tragically exposed to toxic levels of lead through their drinking water supply." The report also notes that the state government should be responsible for remedying the tragedy, "having failed to prevent it."

298.    In October 2015, Defendant Shekter-Smith was reassigned so as to have no responsibility for Flint's drinking water.

299.    On December 5, 2015, the City of Flint declared a state of emergency.

300.    In response to a blog post by Professor Edwards entitled: "*Michigan Health Department Hid Evidence of Health Harm Due to Lead Contaminated Water. Allowed False Public Assurances by MDEQ and Stonewalled Outside Researchers,*" the Governor's Communications Director wrote to Governor Snyder and others "[i]t wasn't until the Hurley report came out that our epidemiologists took a more in-depth look at the data by zip code, controlling for seasonal variation, and confirmed an increase outside of normal trends. As a result of this process we have determined that the way we analyze data collected needs to be thoroughly reviewed."

301.    In other words, MDHHS's failure to properly analyze its own data was a matter of practice, pattern, custom, and/or policy.

302.    On December 23, 2015, the Michigan Auditor General provided an investigative report on the crisis, finding that corrosion control should have been maintained from the beginning and that improper sample sites had been selected by the MDEQ.

303.    On December 30, 2015, Defendants Wyant and Wurfel resigned.

304.    On January 4, 2016, Genesee County declared its own state of emergency.

305.    On January 12, 2016, the Governor called the National Guard into Flint and requested assistance from FEMA.

306.    On January 13, 2015, the Governor announced the massive spike in Legionnaires' disease in Genesee County, ten months after the state was made aware that the spike coincided with the switch to Flint River water.

307.    On January 16, 2016, President Obama declared a federal state of emergency in his January 19, 2016, State of the State address, Governor Snyder admitted to the people of Flint that "Government failed you at the federal, state and local level."

308.    On January 21, 2016, EPA's Susan Hedman resigned over her involvement in the Flint Water crisis.  Hedman had acted with deliberate indifference to the MDEQ's failures to follow federal law and guidelines, and helped to silence Del Toral.

309.    On January 21, 2016, the EPA issued an Emergency Order, based on its finding that "the City of Flint's and the State of Michigan's responses to the drinking water crisis in Flint have been inadequate to protect public health and that these failures continue."

310.    The Emergency Order included as Respondents the City of Flint, the MDEQ, and the Emergency Order provided for the EPA to conduct its own sampling of lead in Flint's water and undertake other actions as part of a process "to abate the public health emergency in the City of Flint."

311.    The Emergency Order notes that "[t]he presence of lead in the City water supply is principally due to the lack of corrosion control treatment after the City's switch to the Flint River as a source in April 2014.  The river's water was corrosive and removed protective coatings in the

system. This allowed lead to leach into the drinking water, which can continue until the system's treatment is optimized."

312. The Emergency Order indicates that "water provided by the City to residents poses an imminent and substantial endangerment to the health of those persons. Those persons' health is substantially endangered by their ingestion of lead in waters that persons legitimately assume are safe for human consumption."

313. Further, the EPA states that "The City, MDEQ and the State have failed to take adequate measures to protect public health."

314. According to the Emergency Order: "Based upon the information and evidence, EPA determines that Respondents' actions that resulted in the introduction of contaminants, which entered a public water system and have been consumed and may continue to be consumed by those served by the public water system, present an imminent and substantial endangerment to the health of persons."

315. In a public statement, EPA Administrator Gina McCarthy declared: "Let's be really clear about why we are here today ... We are here today because a state-appointed emergency manager made the decision that the City of Flint would stop purchasing treated water that had well served them for 50 years and instead purchase untreated – and not treat that water – and by law the state of Michigan approved that switch and did not require corrosion control. All to save money. Now that state decision resulted in lead leaching out of lead service pipes and plumbing, exposing kids to excess amounts of lead. That's why we're here."

316. On January 22, Defendants Shekter-Smith and Busch were suspended without pay. Defendant Shekter-Smith's firing was announced on February 5, 2016.

317.    At one of several congressional hearings on the subject, EPA Deputy Assistant Administrator Joel Beauvais testified "MDEQ incorrectly advised the City of Flint that corrosion-control treatment was not necessary, resulting in leaching of lead into the city's drinking water ... EPA regional staff urged MDEQ to address the lack of corrosion control, but was met with resistance.  The delays in implementing the actions needed to treat the drinking water and in informing the public of ongoing health risks raise very serious concerns."

## COUNT I:

### 42 U.S.C. § 1983 – SUBSTANTIVE DUE PROCESS
### DEPRIVATION OF CONTRACTUALLY CREATED PROPERTY RIGHT

**(Against Defendants City of Flint, Croft, Glasgow, State of Michigan, Snyder, Earley, Ambrose, MDEQ, Shekter-Smith, Wyant, Busch, Cook, Prysby, Wurfel, Dillon, Rosenthal, Wright, Kurtz, Walling and Johnson)**

318.    Plaintiffs hereby incorporate the allegations in paragraphs 1 through 317 of this complaint, as though fully restated herein.

319.    Plaintiffs possessed and were deprived of a state contract law created property right to purchase and receive safe, potable drinking water.

320.    Plaintiffs' right was created by the actions of the parties as well as under Section § 46-16 et. seq. of the Flint City Ordinance.

321.    Plaintiffs' right is so rooted in the traditions and conscience of the American people as to be ranked as fundamental and protected by the Constitution.

322.    Defendants violated Plaintiffs' property right when, ceasing to provide Plaintiffs with safe, potable water, they provided Plaintiffs with poisonous, contaminated water.

323.    The violation of Plaintiffs' property right is not adequately redressed in a state breach of contract action.

324. The violation of Plaintiffs' property right involved Defendants' failure to adequately train, supervise, and/or hire employees.

325. It was Defendants' practice to inadequately train, supervise, and/or hire employees.

326. Defendants' outrageous, deliberate acts and/or inaction in violating Plaintiffs' protected property right caused Plaintiffs to suffer injuries, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988.

327. Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

328. As a direct and proximate result of all of the above Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and property damages (including but not limited to damaged plumbing and lost real property value), and punitive damages.

## COUNT II:

### 42 U.S.C. § 1983 – PROCEDURAL DUE PROCESS
### DEPRIVATION OF CONTRACTUALLY CREATED PROPERTY RIGHT

**(Against Defendants City of Flint, Croft, Glasgow, State of Michigan, Snyder, Earley, Ambrose, MDEQ, Shekter-Smith, Wyant, Busch, Cook, Prysby, Wurfel, Dillon, Rosenthal, Wright, Kurtz, Walling and Johnson)**

329.    Plaintiffs hereby incorporate the allegations in paragraphs 1 through 328 of this complaint as though fully restated herein.

330.    Defendants deprived Plaintiffs of their contractually based property right to purchase and receive safe, potable drinking water without notice or hearing.

331.    Defendants have not provided Plaintiffs with just compensation for their taking of Plaintiffs' property interests.

332.    Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

333.    As a direct and proximate result of all of the above Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and property damages (including but not limited to damaged plumbing and lost real property value), as well as punitive damages.

## COUNT III:

### 42 U.S.C. § 1983 – SUBSTANTIVE DUE PROCESS
### STATE CREATED DANGER

#### (Against All Defendants)

334.    Plaintiffs hereby incorporate the allegations in paragraphs 1 through 333 of this complaint as though fully restated herein.

335.    Plaintiffs in this action are citizens of the United States and all of the Defendants are persons for purposes of 42 U.S.C.  § 1983.

336.    Defendants in this Count III, at all times relevant hereto, were acting under the color of law in their individual and official capacity as State and City officials, and their acts and/or omissions were conducted within the scope of their official duties and employment.

337.    Plaintiffs herein, at all times relevant hereto, have a clearly established Constitutional right under the Fourteenth Amendment, such that the state may not deprive a person of life, liberty or property without due process of law.

338.    Defendants, while acting under color of state law, each acted to expose Plaintiffs to toxic, lead-contaminated water.

339.    Defendants made, caused to be made, and/or were responsible for continued representations that the water was safe to drink.

340.    Defendants' actions and omissions with regard to the switch to the Flint River, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them, and therefore violated the Fourteenth Amendment rights of Plaintiffs.

341.    Defendants' actions and omissions with regard to the switch to the Flint River, as described herein, were malicious and/or involved reckless, callous, and deliberate indifference to Plaintiffs' federally protected rights.  These actions and omissions shock the conscience and

violated the Fourteenth Amendment rights of Plaintiffs, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988.

342.   Defendants obscured and hid information that was known to them to demonstrate the danger that faced Plaintiffs.

343.   Defendants acted with a deliberate indifference to a known and/or obvious danger.

344.   Defendants created and/or increased the danger facing Plaintiffs.

345.   Defendants' actions constituted gross negligence, because they were so reckless as to demonstrate a substantial lack of concern for whether an injury would result.

346.   As a result of the actions of the Defendants, Plaintiffs suffered injuries, including but not limited to personal injuries, illnesses, exposure to toxic substances, and property damage.

347.   Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

348.   As a direct and proximate result of all of the above Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and property damages (including but not limited to damaged plumbing and lost real property value), and punitive damages.

## COUNT IV:

### 42 U.S.C. § 1983 – SUBSTANTIVE DUE PROCESS
### BODILY INTEGRITY

#### (Against All Defendants)

349.    Plaintiffs hereby incorporate the allegations in paragraphs 1 through 348 of this complaint as though fully restated herein.

350.    Plaintiffs in this action are citizens of the United States and all of the Defendants are persons for purposes of 42 U.S.C. § 1983.

351.    All Defendants, at all times relevant hereto, were acting under the color of law in their individual and official capacity as State and City officials, and their acts and/or omissions were conducted within the scope of their official duties and employment.

352.    Plaintiffs have a clearly established right to bodily integrity under the Fourteenth Amendment.

353.    At all times relevant hereto, that right is and has been well established.

354.    In providing Plaintiffs with contaminated water, and/or causing Plaintiffs to consume that water, Defendants violated Plaintiffs' right to bodily integrity, insofar as Defendants failed to protect Plaintiffs from a foreseeable risk of harm from the exposure to lead contaminated water.

355.    As a result of Defendants' actions and/or omissions, Plaintiffs suffered bodily harm and their rights to bodily integrity were violated.

356.    Defendants' actions were malicious, reckless, and/or were made with deliberate indifference to Plaintiffs' constitutional rights.   Defendants engaged in these acts willfully, maliciously, in bad faith, and/or in reckless disregard for Plaintiffs' constitutional rights.

357.    Defendants' actions shock the conscience of Plaintiffs and of any reasonable person.

358.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injuries and seek relief as described in this complaint.

359.    Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

360.    As a direct and proximate result of all of the above Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and property damages (including but not limited to damaged plumbing and lost real property value), and punitive damages.

## COUNT V:

### 42 U.S.C. § 1983 – EQUAL PROTECTION OF THE LAW: RACE-BASED

### (Against Defendants Snyder, Dillon, Wright, Walling Ambrose, Kurtz and Earley)

361.    Plaintiffs hereby incorporate the allegations in paragraphs 1 through 360 of this complaint as though fully restated herein.

362.    Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz and Earley, acting under color of law, and in their respective individual and/or official capacities, engaged in

conduct and/or adopted laws and policies that violated Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution.

363.    Amendment Fourteen, § 1 states in pertinent part: "No state shall make or enforce any law which shall … deny to any person within its jurisdiction the equal protection of the laws."

364.    The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

365.    Defendants' conduct deliberately exposed Plaintiffs to contaminated Flint River water, knowing that it could and would result in widespread serious damage.

366.    In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built.  This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 through approximately October 2016 when the KWA water system was to become operational.)

367.    These Defendants knew that the water from the Flint River was grossly inferior to the Lake Huron water Flint and Genesee County citizens had been receiving from DWSD.

368.    These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP, which would have required millions of dollars of upgrades.

369.    These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

370.    Recognizing these facts, Defendants devised an Interim Plan that caused predominately white water users of those areas of Genesee County outside of Flint to receive the safe and superior water from DWSD, whereas the water users of predominately African

American Flint received water that was known to be grossly inferior and unsafe, i.e. Flint River water.

371.   As evidence of the fact that race discrimination was the reason for treating the two groups of water users differently, the cost of continuing with finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less than the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

372.   Given the clear difference in the treatment between these two groups of similarly situated water users, the deliberate decisions and actions of these Defendants in devising the Interim Plan was the product of racial discrimination in violation of the Equal Protection Clause.

373.   If Plaintiffs' community had been predominately white, Plaintiffs would have been treated in the same manner as their predominantly white neighbors in Genesee County and they too would have received DWSD water as part of the Interim Plan.

374.   Because Plaintiffs were water users in a predominately African American community, their complaints were dismissed and disrespected as exaggerated, without merit or inconsequential.   If Plaintiffs' community had been predominately white, citizen complaints would have been taken seriously, treated as valid and the MDEQ and Flint public officials would have taken timely action to address the concerns.

375.   As a direct and proximate result of the unconstitutional acts of Defendants as alleged herein, Plaintiffs have suffered violations of their fundamental constitutional rights including, but not limited to:

   a.   Serious and in some cases life threatening and irreversible bodily injury;

   b.   Substantial economic losses from medical expenses;

   c.   Pain and suffering; and

d. Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

376. The conduct of Defendants was reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT VI:

### 42 U.S.C. § 1983 – EQUAL PROTECTION OF THE LAW: WEALTH-BASED

### (Against Defendants Snyder, Dillon, Wright, Walling Ambrose, Kurtz and Earley)

377. Plaintiffs hereby incorporate the allegations in paragraphs 1 through 376 of this complaint as though fully restated herein.

378. Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz and Earley, acting under color of law, and in their respective individual and/or official capacities, engaged in conduct and/or adopted laws and policies that violated Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution.

379. Amendment Fourteen, § 1 states in pertinent part: "No state shall make or enforce any law which shall … deny to any person within its jurisdiction the equal protection of the laws."

380. The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

381. Defendants' conduct deliberately exposed Plaintiffs to contaminated Flint River water, knowing that it could and would result in widespread serious damage.

382. In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan

would be in effect for more than 2.5 years (April 25, 2014 through approximately October 2016 when the KWA water system was to become operational.)

383. These Defendants knew that the water from the Flint River was grossly inferior to the Lake Huron water Flint and Genesee County citizens had been receiving from DWSD.

384. These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP, which would have required millions of dollars of upgrades.

385. These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

386. Recognizing these facts, Defendants devised an Interim Plan that allowed predominately more affluent water users of those areas of Genesee County outside of Flint to receive the safe and superior water from DWSD and the predominantly impoverished water users of Flint would have to accept during the interim period grossly inferior and unsafe, previously rejected Flint River water.

387. There was no rational economic or fiscal justification for treating the predominately more affluent water users of Genesee County differently than the predominately impoverished water users of Flint because the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less than the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

388. Given the unexplained difference in the treatment between these two groups of similarly situated water users, considering the absence of any rational economic justification, and taking into account the economic makeup of the group that received the grossly inferior and dangerous water product, the deliberate decisions and actions of these Defendants in devising the

Interim Plan can fairly be said to be the product of income and class discrimination, in violation of the Equal Protection Clause of the 14th Amendment.

389.    If Plaintiffs' community had been predominately more affluent, Plaintiffs would have been treated in the same manner as their more affluent neighbors in Genesee County and they too would have received DWSD water as part of the Interim Plan.

390.    Because Plaintiffs were in a predominately impoverished community, their complaints were dismissed and disrespected as exaggerated, without merit or inconsequential.  If Plaintiffs' community had been predominately more affluent, citizen complaints would have been taken seriously, treated as valid and the MDEQ and Flint public officials would have taken timely action to address the concerns.

391.    As a direct and proximate result of the unconstitutional acts of Defendants as alleged herein, Plaintiffs have suffered violations of their fundamental constitutional rights including, but not limited to:

  a.  Serious and in some cases life threatening and irreversible bodily injury;

  b.  Substantial economic losses from medical expenses;

  c.  Pain and suffering; and

  d.  Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

392.    The conduct of Defendants was reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT VII**

**42 U.S.C § 1985(3) – INVIDIOUS RACIAL ANIMUS**

**(Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz and Earley)**

393.    Plaintiffs hereby incorporate the allegations in paragraphs 1 through 392 of this complaint as though fully restated herein.

394.    Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz and Earley, acting under color of law, and in their respective individual and/or official capacities, engaged in conduct and/or adopted laws and policies that violated Plaintiffs' rights under the Fifth and Thirteenth Amendment to the United States Constitution.

395.    42 U.S.C. § 1985(3) secures the rights of Plaintiffs to be free from conspiracies, founded on invidious racial animus, to violate the constitutional rights of Plaintiffs to equal protection and due process.

396.    The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

397.    Defendants' conduct deliberately exposed Plaintiffs to contaminated Flint River water, knowing that it could and would result in widespread serious damage.

398.    In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built.  This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 through approximately October 2016 when the KWA water system was to become operational.)

399.    These Defendants knew that the water from the Flint River was grossly inferior to the Lake Huron water Flint and Genesee County citizens had been receiving from DWSD.

72

400. These Defendants knew that the raw water from the Flint River would have to be processed at the Flint WTP, which would have required millions of dollars of upgrades.

401. These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

402. Recognizing these facts, Defendants conspired to devise an Interim Plan that allowed the predominately white water users of Genesee County to receive the safe and superior water from DWSD and the predominantly African American water users of Flint would have to accept during the interim period water that was known to be grossly inferior and unsafe, i.e. Flint River water.

403. There was no rational economic or fiscal justification for treating the predominately white water users of Genesee County differently than the predominately African American water users of Flint, because the cost of continuing with the finished water product from the DWSD for all water users (both Genesee County and Flint) would have been substantially less than the cost of upgrading the Flint WTP in order to safely process the raw Flint River water.

404. Given the unexplained difference in the treatment between these two groups of similarly situated water users, considering the absence of any rational economic or fiscal justification and taking into account the racial composition of the community that received the grossly inferior and dangerous water product, the deliberate decisions and actions of these conspiring Defendants in devising the Interim Plan can fairly be said to be the product of invidious racial animus in violation of the Thirteenth Amendment. The provision of unhealthy and dangerous food and water is a badge, vestige and symbol of slavery abolished and prohibited by the Thirteenth Amendment.

405.     If Plaintiffs' community had been predominately white, Plaintiffs would have been treated in the same manner as their predominantly white neighbors in Genesee County and they too would have received DWSD water as part of the Interim Plan.

406.     Because Plaintiffs were water users in a predominately African American community, their complaints were dismissed and disrespected as exaggerated, without merit or inconsequential.  If Plaintiffs' community had been predominately white, citizen complaints would have been taken seriously, treated as valid and the MDEQ and Flint public officials would have taken timely action to address the concerns.

407.     As a direct and proximate result of the unconstitutional acts of Defendants as alleged herein, Plaintiffs have suffered violations of their fundamental constitutional rights including, but not limited to:

    a.   Serious and in some cases life threatening and irreversible bodily injury;

    b.   Substantial economic losses from medical expenses;

    c.   Pain and suffering; and

    d.   Embarrassment, outrage, mental anguish, fear and mortification, and stress  related physical symptoms.

408.     The conduct of Defendants was reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT VIII:

### BREACH OF CONTRACT

**(Against Defendants City of Flint and the State of Michigan)**

409.     Plaintiffs hereby incorporate the allegations in paragraphs 1 through 408 of this complaint as though fully restated herein.

410.    Defendant City of Flint, by its statutes and by offering services to its residents, offers to sell potable, safe drinking water to its residents.

411.    Plaintiffs accepted the offer by utilizing Flint's water, agreeing to pay for the water, and tendering payment for the water.

412.    Plaintiffs and Defendant City of Flint entered into a contract for the purchase and sale of potable, safe drinking water.

413.    Defendant State of Michigan overtook the local government of Flint and assumed and/or shared its duties under the contract to sell potable, safe drinking water to Plaintiffs.

414.    Defendants materially and irreparably breached the contract with Plaintiffs by failing to provide potable, safe drinking water, and instead providing harmful, foul, contaminated water unfit for human consumption.

415.    As a result of Defendants' breach, Plaintiffs suffered damages in the amount of all debts and obligations for Flint water, whether tendered or untendered, and as stated throughout this complaint.

416.    Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

417.    As a direct and proximate result of the above Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and

property damages (including but not limited to damaged plumbing and lost real property value), and exemplary damages.

## COUNT IX:

## BREACH OF IMPLIED WARRANTY

### (Against Defendants City of Flint and the State of Michigan)

418.    Plaintiffs hereby incorporate the allegations in paragraphs 1 through 417 of this complaint as though fully restated herein.

419.    The State of Michigan and the City of Flint directly promised to provide water that was fit for human consumption and/or impliedly promised that the water was fit for human consumption.

420.    The State of Michigan and the City of Flint have both admitted that the water it supplied was contamination, including being poisoned with lead, and therefore clearly not fit for its intended use of human consumption.

421.    The provision of water unfit for its intended purpose and/or the admission that the water was not fit for its intended purpose constitute material breaches of an implied warranty and/or contract.

422.    Defendants are liable to Plaintiffs for all amounts billed and/or charged and/or collected, whether paid or unpaid, for water that was unfit for human consumption.

423.    Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

424.    As a direct and proximate result of the individual Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other

76

organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and property damages (including but not limited to damaged plumbing and lost real property value), and exemplary damages.

## COUNT X:

## NUISANCE

## (Against All Defendants)

425.    Plaintiffs hereby incorporate the allegations in paragraphs 1 through 424 of this complaint as though fully restated herein.

426.    Defendants' actions in causing foul, poisonous, lead contaminated water to be delivered to the homes of Plaintiffs resulted in the presence of contaminants in Plaintiffs' properties and/or persons.

427.    Defendants' actions substantially and unreasonably interfered with Plaintiffs' comfortable living and ability to use and enjoy their homes, constituting a nuisance.

428.    Plaintiffs did not consent for foul, poisonous, lead contaminated water to physically invade their persons or property.

429.    Plaintiffs suffered injuries and damage to their persons and/or properties as a direct and proximate result of Defendants' actions in causing lead contaminated water to be delivered to their homes.

430. Defendants' actions in causing a substantial and unreasonable interference with Plaintiffs' ability to use and enjoy their properties constitutes a nuisance and Defendants are liable for all damages arising from such nuisance, including compensatory and exemplary relief.

431. Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

432. As a direct and proximate result of the Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and property damages (including but not limited to damaged plumbing and lost real property value), as well as exemplary damages.

## COUNT XI:

## TRESPASS

## (Against All Defendants)

433. Plaintiffs hereby incorporate the allegations in paragraphs 1 through 432 of this complaint as though fully restated herein.

434. Defendants' negligent, grossly negligent, willful, and/or wanton conduct and/or failures to act caused contaminants to enter upon Plaintiffs' property and into Plaintiffs' persons.

435. Upon information and belief, Defendants had exclusive control over the facilities providing Plaintiffs' water at all relevant times.

436.    Defendants, knowingly or in circumstances under which they should have known, engaged in deliberate actions that released contaminants which were substantially certain to invade the properties of Plaintiffs.

437.    Defendants knew or should have known of the likelihood that corrosive water would cause lead to drink into Plaintiffs' drinking water.

438.    Defendants' actions resulted in contaminants entering into Plaintiffs' persons and properties, causing injury and damage to person and property.

439.    Defendants' actions were done with actual malice or wanton, reckless or willful disregard for Plaintiffs' safety, rights, and/or property.

440.    Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

441.    As a direct and proximate result of the Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and property damages (including but not limited to damaged plumbing and lost real property value), and exemplary damages.

## COUNT XII:

## UNJUST ENRICHMENT

### (Against Defendants City of Flint and State of Michigan)

442. Plaintiffs hereby incorporate the allegations in paragraphs 1 through 441 of this complaint as though fully restated herein.

443. Defendants have received the benefits of the funds paid by Plaintiffs for contaminated water that was and is unfit for human consumption.

444. Defendants have utilized these funds for the operation of the government(s) of Flint and/or Michigan.

445. The retention of the benefit of the funds paid by Plaintiffs constitutes unjust enrichment in the amount of all funds paid for water that was unfit for human consumption.

446. It would be unjust to allow Defendants to retain the benefit they obtained from Plaintiffs.

## COUNT XIII:

## GROSS NEGLIGENCE

### (Against Defendants Snyder, Croft, Glasgow, Earley, Kurtz, Ambrose, Shekter-Smith, Wyant, Busch, Cook, Prysby, Wurfel, Wells, Peeler and Scott)

447. Plaintiffs hereby incorporate the allegations in paragraphs 1 through 446 of this complaint as though fully restated herein.

448. Defendants independently owed Plaintiffs a duty to exercise reasonable care.

449. Defendants undertook, for consideration, to perform a duty owed to Plaintiffs and by the City of Flint and/or the State of Michigan.

450. Based on their undertakings, Defendants had a duty to Plaintiffs to exercise reasonable care to protect that undertaking.

451.    Plaintiffs relied on the City, State, and/or Defendants to perform the duty to ensure the proper treatment of Flint River Water.

452.    Plaintiffs relied on the City, State, and/or Defendants to perform the duty to disclose known hazards in their drinking water.

453.    Defendants failed to exercise reasonable care.

454.    Defendants breached their duties to Plaintiffs in ways including but not limited to the following:

   a.  Failing to require corrosion control treatment of Flint River water;

   b.  Failing to conduct proper testing of Flint's water;

   c.  Failing to require proper testing of Flint's water;

   d.  Failing to respond to evidence that Flint's water was improperly treated;

   e.  Misrepresenting that corrosion control treatment had been implemented;

   f.  Publically declaring unsafe water to be safe to drink;

   g.  Ignoring evidence that Flint's water was unsafe to drink;

   h.  Withholding information that showed that Flint's water was unsafe to drink;

   i.  Publicly discrediting those who claimed that Flint's water may not be safe to drink;

   j.  Failing to warn Plaintiffs the public that Flint's water was not safe to drink.

455.    Plaintiffs suffered harm resulting from Defendants' failures to exercise reasonable care.

456.    Plaintiffs suffered harm resulting from Defendants' failures to exercise reasonable care to protect their undertakings.

457.    Defendants' failures to exercise reasonable care to protect their undertakings proximately caused the Plaintiffs' injuries and were entirely foreseeable.

458.    Defendants are liable to Plaintiffs for all harms resulting to themselves and their property from Defendants' failures to exercise reasonable care.

459.    Defendants' liability includes without limitation personal injuries, illnesses, exposure to toxic substances, and property damage suffered by Plaintiffs as a result of Defendants' failures to exercise reasonable care.

460.    Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

461.    All of the above individual Defendants' conduct and/or failure to act constitute gross negligence because it was so reckless that it demonstrates a substantial lack of concern for whether injury would result.

462.    The performance of governmental functions constituting gross negligence falls within the exceptions of governmental immunity pursuant to MCL 691.1407.

463.    As a direct and proximate result of the above individual Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and property damages (including but not limited to damaged plumbing and lost real property value), as well as punitive and/or exemplary damages.

<u>**COUNT XIV:**</u>

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(Against All Defendants)**

464.   Plaintiffs hereby incorporate the allegations in paragraphs 1 through 463 of this complaint as though fully restated herein.

465.   Defendants' outrageous conduct in causing, prolonging, and obscuring Plaintiffs' exposure to toxic, lead contaminated water exceeds all bounds of decency in a civilized society.

466.   Defendants' outrageous conduct was intentional and/or reckless and made with a conscious disregard for the rights and safety of Plaintiffs.

467.   Defendants' outrageous conduct caused severe distress to Plaintiffs.

468.   Defendants' outrageous conduct was the proximate cause of Plaintiffs' injuries.

469.   As a direct and proximate result of the above individual Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and property damages (including but not limited to damaged plumbing and lost real property value), as well as punitive and/or exemplary damages.

## COUNT XV:

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

470.    Plaintiffs hereby incorporate the allegations in paragraphs 1 through 469 of this complaint as though fully restated herein.

471.    Defendants were in a special relationship to Plaintiffs, being persons entrusted with the protection of their most basic needs – water, health, and safety.

472.    The distress caused to Plaintiffs by Defendants was highly foreseeable.

473.    Defendants placed Plaintiffs in a zone of physical danger, causing them severe emotional distress.

474.    Plaintiffs have contemporaneously perceived the exposure of their immediate family members to lead contaminated water.

475.    Defendants' negligent acts were the proximate cause of Plaintiffs' contemporaneous perception of their loved ones exposure to lead contaminated water.

476.    Defendants' negligent acts were the proximate cause of Plaintiffs being placed into a zone of physical danger and resulting severe emotional distress.

477.    Defendants' negligent acts were the proximate cause any and all severe emotional distress related to their own exposure and their families' exposure to lead contaminated water.

478.    As a direct and proximate result of the above individual Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification,

medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and property damages (including but not limited to damaged plumbing and lost real property value), as well as punitive and/or exemplary damages.

479. At critical times including during gestation and her developmental years, the minor plaintiff has been exposed to damaging levels of lead and other toxic substances. Plaintiffs' damages and losses include, but are not limited to, physical and psychological injuries, learning and other permanent disabilities, weight loss, stunted growth, anemia, headaches, abdominal and other pain, mental anguish, emotional distress, the cost of medical, educational, and rehabilitation expenses, and other expenses of training and assistance, and loss of income and earning capacity

480. Plaintiffs, at the time of sustaining the injuries complained of herein, have been the owners, lessees and/or occupants of certain real property located in Flint, Michigan, that received highly corrosive and contaminated water pumped from the Flint River.

481. Upon information and belief, Defendants, who were acting under the color of law, deprived Plaintiffs of their rights under the 14th Amendment to the United States Constitution. Specifically, Defendants deprived Plaintiffs of life, liberty and property without due process of law when the decision to switch to the Flint River was made, thus providing Plaintiffs with toxic and unsafe water.

## COUNT XVI:

## PROPRIETARY FUNCTION

### (Against All Defendants)

482. Plaintiffs hereby incorporate the allegations in paragraphs 1 through 481 of this complaint as though fully restated herein.

483. At relevant times, Defendants engaged in proprietary functions, specifically, the sale of potable water to Plaintiffs.

484. Defendants' primary purpose in the aforementioned facts was to produce a pecuniary profit for the governmental agencies.

485. The relevant activities are not normally supported by taxes and fees.

486. The conduct of Defendants constituted "proprietary function" in avoidance of governmental immunity.

487. The performance of governmental functions constituting proprietary function falls within the exceptions of governmental immunity pursuant to MCL 691.1413.

488. Defendants independently owed Plaintiffs a duty to exercise reasonable care.

489. Based on their undertakings, Defendants had a duty to Plaintiffs to exercise reasonable care to protect that undertaking.

490. Plaintiffs relied on Defendants to perform the duty to ensure the proper treatment of Flint River Water.

491. Plaintiffs relied on Defendants to perform the duty to disclose known hazards in their drinking water.

492. Defendants failed to exercise reasonable care.

493.    Defendants breached their duties to Plaintiffs in ways including but not limited to the following:

      a.  Failing to require corrosion control treatment of Flint River water;

      b.  Failing to conduct proper testing of Flint's water;

      c.  Failing to require proper testing of Flint's water;

      d.  Failing to respond to evidence that Flint's water was improperly treated;

      e.  Misrepresenting that corrosion control treatment had been implemented;

      f.  Publically declaring unsafe water to be safe to drink;

      g.  Ignoring evidence that Flint's water was unsafe to drink;

      h.  Withholding information that showed that Flint's water was unsafe to drink;

      i.  Publicly discrediting those who claimed that Flint's water may not be safe to drink;

      j.  Failing to warn Plaintiffs the public that Flint's water was not safe to drink.

494.    Plaintiffs suffered harm resulting from Defendants' failures to exercise reasonable care.

495.    Defendants are liable to Plaintiffs for all harms resulting to themselves and their property from Defendants' failures to exercise reasonable care.

496.    Defendants' liability includes without limitation personal injuries, illnesses, exposure to toxic substances, and property damage suffered by Plaintiffs as a result of Defendants' failures to exercise reasonable care.

497.    Defendants' actions and/or omissions were the proximate cause of the Plaintiffs' injuries.

498.    As a direct and proximate result of the above individual Defendants' conduct and/or failures to act, Plaintiffs have suffered past, present and future personal injuries, including but not limited to: various health problems (including without limitation hair, skin, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits, lost earning capacity, aggravation of pre-existing conditions, contract damages and property damages (including but not limited to damaged plumbing and lost real property value), as well as punitive and/or exemplary damages.

## COUNT XVII:

### MCL 37.2302 – VIOLATION OF PUBLIC SERVICE PROVISIONS OF ELCRA

### (Against Defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, Earley & Flint)

499.    Plaintiffs hereby incorporate the allegations in paragraphs 1 through 498 of this complaint as though fully restated herein.

500.    Defendants Flint, Kurtz, Walling, Ambrose and Earley represent a public facility, agency, board owned and operated by a political subdivision of the state established to provide service to the public.  MCL 37.2301(b).

501.    If not "provider[s]" of a public service, Wright, Walling, Ambrose, Kurtz and Earley are liable under MCL 37.2701 because they aided or abetted the "provider" to violate MCL 37.2302(a).

502.    Defendants Snyder and Dillon are liable under MCL 37.2701 because they aided the "provider" of water services to Plaintiffs in the acts that denied Plaintiffs of the full and equal enjoyment of water services because of race.

503. These defendants were under a statutory duty to either provide water services to Plaintiffs so that they would not be denied the full and equal enjoyment of public water service on account of race, or that they aided and abetted the public service provider to deny Plaintiffs full and equal enjoyment of public water service.

504. In 2013, Defendants were required to develop an Interim Plan to deliver water to Genesee County and Flint while the KWA water system was being built. This Interim Plan would be in effect for more than 2.5 years (April 25, 2014 until approximately October 2016 when the KWA water system would become operational).

505. These Defendants knew that the water from the Flint River was grossly inferior to the water Flint and Genesee County citizens had been receiving from DWSD.

506. These Defendants knew that the water from the Flint River would have to be processed at the Flint Water Treatment Plant, which required millions of dollars of upgrades.

507. These Defendants knew that using the raw water from the Flint River had been rejected as recently as 2011.

508. Recognizing these facts, Defendants devised an Interim Plan that allowed the predominantly white water users of Genesee County to receive the safe, superior water from DWSD and the predominately black water users of Flint would have to accept during the interim period grossly inferior, previously rejected and potentially unsafe Flint River water.

509. There was no rational economic justification for treating the predominately white water users from those areas of Genesee County outside of Flint differently than the users of water from Flint, a predominately African American community. This is so because the cost of continuing with the finished water product from the DWSD for all water users (both Genesee

County and Flint) would have been substantially less than the cost of upgrading the Flint Water Treatment Plant in order to safely process the raw Flint River water.

510.   Given the unexplained difference in treatment between these two groups of similarly situated water users, considering the absence of any rational economic or fiscal justification, and taking into account the racial makeup of the community that received the grossly inferior and dangerous water product, the deliberate decisions and actions of these conspiring Defendants in devising the Interim Plan can fairly be said to be the product of racial discrimination in violation of MCL 37.2302(a).

511.   If Plaintiffs' community had been predominately white, Plaintiffs would have been treated just like their neighbors from the predominantly white neighborhoods in Genesee County, and they too would have received DWSD water as part of the Interim Plan.

512.   As a direct and proximate result of the violation of the ELCRA as alleged in this Complaint, Plaintiffs have experienced damages including, but not limited to:

   a.   Serious and in some cases life threatening and irreversible bodily injury;

   b.   Substantial economic losses from medical expenses, lost wages, lost income, lost business profits; reduced property values, among others;

   c.   Pain and suffering;

   d.   Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

## COUNT XVIII:

## PUNITIVE DAMAGES

### (All Defendants)

513.   Plaintiffs hereby incorporate the allegations in paragraphs 1 through 512 of this complaint as though fully restated herein.

514.   Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing property damage, nuisances, and trespasses upon Plaintiffs' persons and properties, disregarding the rights of Plaintiffs.

515.   Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to:

   a.   failure to provide safe drinking water to the residents of Flint;

   b.   failure to implement adequate corrosion controls for Flint River water; and

   c.   underestimating the seriousness of the lead contamination in Flint's water system.

516.   Defendants have caused great harm to Plaintiffs' property and water supplies and demonstrated an outrageous conscious disregard for Plaintiffs' safety with implied malice, warranting the imposition of punitive damages.

## DEMAND FOR JURY TRIAL

517.   Plaintiffs hereby demand a jury trial pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable in this action.

## RELIEF REQUESTED

518.   WHEREFORE, this Complaint is being plead in avoidance of governmental immunity and the Defendants' defense of governmental immunity is voidable due to the proprietary function and gross negligence exceptions as well as all other relevant exceptions and

Plaintiffs demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

    a.  An order declaring the conduct of defendants unconstitutional;

    b.  An order of equitable relief to remediate the harm caused by defendants of unconstitutional conduct including repairs or property, establishment of a medical monitoring fund, and appointing a monitor to oversee the water operations of Flint for a period of time deemed appropriate by the court;

    c.  An order for an award for general damages;

    d.  An order for an award of compensatory damages;

    e.  An order for an award of punitive damages;

    f.  An order for an award of actual reasonable attorney fees and litigation expenses;

    g.  An order for all such other relief the court deems equitable.

Respectfully submitted,

*/s/ Vinson F. Carter*
Vinson F. Carter
ROBINSON, CARTER,
CRAWFORD, PLLC
2387 Linden Road
Flint, Ml 48532
810-496-1025
v.rcclawgroup@gmail.com
*Counsel for Plaintiffs*

Dated: January 18, 2017